David Berry Hill, the appellant, and Cecil Nathan Herron were separately indicted for the murder of Walter Luke Evans. The defendants were joined for trial and both men were convicted and sentenced to ninety-nine years' imprisonment. We find that the defendants were improperly joined for trial because their defenses were antagonistic and mutually exclusive.
Prior to trial, the prosecutor filed a "motion to consolidate" on the grounds that "each of the above Defendants has been charged in separate Indictments alleging participation in offenses that are the same act or transaction, or are a part of a common conspiracy, scheme, or plan or are otherwise so closely connected that it would be difficult to separate one from proof of the other."
The trial judge denied this motion, but later granted a motion to reconsider and ordered the defendants joined for trial finding "that these cases are suitable for consolidation, within the rules of Criminal Procedure, and can be consolidated and tried together without prejudice to either defendant." Hill filed a brief in opposition to the State's motion for joinder preserving the issue of antagonistic defenses: "What more antagonistic defenses can exist than putting two people on trial in the same proceeding where one defendant testifies and states the other defendant is guilty and that same defendant then testifies and states the other defendant is guilty?"
At trial, each defendant attempted to incriminate the other. In opening argument, the prosecution argued that "these two defendants acted in concert before, during, and after this event, that they were together like hand and glove all the way through." Herron's attorney argued that "Hill by himself, not in concert with anyone, took the life of Walter Evans." Hill's attorney argued that "Herron acted alone, that David Hill had nothing to do with this killing, and that . . . only Cecil Herron committed this killing."
The State's evidence against Herron and Hill was circumstantial. That evidence was to the effect that sometime after 2:00 on the afternoon of December 3, 1982, nineteen-year-old Hill and eighteen-year-old Herron took Brenda Cooper to meet sixty-four-year-old Evans at Evans' house. Hill, Herron, Cooper and Evans were in Evans' residence at either 8:00 or 8:30 P.M. when Mrs. Hill called her husband. During the evening, Miss Cooper objected to Herron's suggestion that Evans "take her to bed," and everyone left the house to purchase some more beer.
Evans bought Herron some gasoline and the four people "rode around" after buying some beer in Madison County. Miss Cooper testified that, during this time, Herron started "smarting off" wanting "to have an orgy" or "get naked and jump in a pile."
Hill, Herron, Evans and Miss Cooper returned to her trailer where Herron ripped off her clothes and pulled off Evans' pants. Herron and Hill were completely naked. Miss Cooper testified that, before anything further happened, she sent Hill and Herron to buy some more beer. Miss Cooper testified that everyone had been drinking, but that Hill was "wiped out" and more intoxicated than anyone else. She stated that *Page 421 
Hill "was willing to go along with anything Cecil [Herron] said."
Miss Cooper's boyfriend, Tom Cremeans, arrived and saw Hill and Herron sitting in a car outside Miss Cooper's trailer. He went in the trailer and found Miss Cooper naked. Cremeans got into a fight with Evans, hit him two or three times, and pushed him out of the trailer. Herron helped Evans in the car and began "hollering" at Cremeans, who went inside. Herron took a stick or board and burst the front windshield in Cremeans' automobile. Hill, Herron and Evans then drove off together. Hill left wearing only his blue jeans. His shirt and shoes were found at Miss Cooper's trailer the next day by the police.
Hershell Nix, the owner of the trailer park, was alerted by all the noise at Miss Cooper's trailer. He witnessed the events which occurred outside the trailer. When Hill and Herron left with Evans, Nix ordered Cremeans to leave. These events occurred around 10:30 or 11:00 P.M. Cremeans left but later returned and took Miss Cooper to his trailer.
An unidentified white male telephoned the Decatur Police Department at 12:26 on the morning of December 4, 1982, and reported that someone was hurt and bleeding at Evans' residence. The police were on the scene at approximately 12:29 A.M. and they discovered Evans' almost lifeless body in his bedroom. No one else was observed in or near the residence. The paramedics arrived around 12:30 P.M. and took Evans to the hospital where he later died. Evans had been cut and stabbed and died "as a result of a cut injury on the left side of his neck which resulted in the softening of the brain and destruction of the same."
Kenneth Driskell testified that, between 11:30 P.M. and 1:30 A.M. on the night of the murder, Herron stopped him outside the Happy People's Club and asked Driskell where he could get some marijuana. Hill was in the car with Herron. Driskell gave Herron two marijuana cigarettes in exchange for a radio which belonged to Evans.
Hill and Herron returned to Hill's apartment between 1:00 and 2:00 that morning. Mrs. Hill testified that Hill was intoxicated and "messed up bad, and he looked to be in a state of shock." Hill told his wife that he had "never seen so much blood," and that he had found Evans in his home lying "face down on the floor in a puddle of blood." Herron had blood on his hands and washed it off at Hill's apartment. Herron was wearing Evans' cowboy hat and also had Evans' pocketknife. Mrs. Hill testified that Herron was only "acting like he was messed up, . . . and was definitely acting."
The State produced expert testimony to show that three buttons found at the scene of the murder were consistent with and similar to the buttons on Herron's shirt, four of which were missing. Blood on a jacket found in Herron's automobile was the same type as that of Evans.
Hill testified in his own defense that he and Herron took Brenda Cooper to meet Walter Evans. They were "going to split however much Brenda got if she went to bed with him." After a short time these four people left Evans' house to buy some more beer and on the way stopped to put gasoline in Herron's car. Hill testified that he had been drinking and smoking marijuana, and that he passed out and did not remember anything after the gas station, which was around 3:30 in the afternoon. After Hill passed out he did remember hearing Herron ask Evans for some money.
Hill testified that when he woke up, around 12:30 that night, he was outside Evans' house clad only in his blue jeans. He heard a "scuffle," went inside, saw two "puddles of blood" in the hallway, walked to Evans' bedroom and saw Herron "standing there over Mr. Evans with a [pocket] knife in his hand." Evans "had blood from his head to his shoulders." Hill did not know whether the knife, which belonged to Evans, was open or closed.
Hill asked what happened and Herron "mentioned that Brenda's boyfriend had gotten into it with Mr. Evans, and that he had followed us" to Evans' house. Hill *Page 422 
stated that Herron told him that Miss Cooper's "boyfriend had come up and caught them at the trailer and he thought her boyfriend had followed him over there and did that to Mr. Evans." Hill told Herron to call an ambulance and then went to Herron's car.
Hill testified that the next thing he remembered after leaving Evans' trailer was the next morning when his wife told him that Herron had brought him home, that Herron had blood on him and that Herron told them that a man "jumped" on Evans at Miss Cooper's trailer and Herron "had to get him off."
In his defense, Hill called five witnesses besides himself. Ruby Herron, defendant Herron's mother, testified that her son had two buttons missing off his shirt and that she did not notice any blood on him.
Thelma Carter, Hill's mother, testified that Hill and Herron arrived at Hill's apartment between 1:30 and 2:00 on the morning of December 4, 1982. Hill was "in shock or something." She saw "spots of blood" on Herron's shirt and stated that Herron was "just laughing and carrying on and talking about having some kind of a knife" which she never saw. Herron told her that "this lady's boyfriend come up and caught Mr. Evans and her in bed together, and . . . he [Herron] got him a stick and beat him off."
Martha Sue Smith, Hill's sister, testified that when Hill came home he was in a daze. She stated that Herron said that he had "pulled some man off Mr. Evans" and that "the man started to cut Mr. Evans and then Cecil [Herron] jumped on the man with a stick." Herron had "little specks" that "looked similar to blood" on his shirt and he had blood on his hands. Herron was "trying to get rid of" a knife and a cowboy hat that belonged to Evans.
Miss Smith testified that, after Herron left Hill's apartment, Hill told her that he had found Evans "lying down in a puddle of blood." Herron never mentioned anything about finding Evans.
Miss Smith also admitted that she told the police that both Hill and Herron told the story of finding Evans and that Herron "also mentioned several times they should go back and check on Mr. Evans, and then he would laugh."
Talmadge Townsend was also at Hill's apartment that early Saturday morning. He testified that Herron had "blood on his hands" and "a little blood on his shirt." Herron also had "a little knife" and said that Miss Cooper's boyfriend "beat up" Evans and that "they had to drag Brenda's boyfriend off of the man."
Hill's last witness was Gwin Morgan who testified that, about 11:00 on the night of December 3, 1982, she saw Herron, Hill and "an older-like guy" in a car at the Community Center in East Acres. Hill was "in the back seat passed out."
Herron testified in his own behalf and was the only witness for his defense. He stated that Miss Cooper and Hill were "[t]alking about how they were going to beat him [Evans] out of money and everything, how they had had him write checks for them before. Said he would do it again." Herron testified that Hill said that "he could get him [Evans] to write checks very easy."
Herron stated that he and Hill took Evans to Miss Cooper's trailer, where Hill, being too intoxicated, unsuccessfully attempted to have sexual intercourse with Miss Cooper. Miss Cooper's boyfriend arrived and "jumped on Mr. Evans," and pushed him out of the trailer. Hill "got out the back side trailer door somehow" with only his blue jeans on. Herron got "mad" because the boyfriend was assaulting Evans, so Herron got a stick and "burst the windshield out of his [Cremeans'] car."
Herron testified that he, Hill and Evans returned to Evans' trailer and that he did not notice anything until Hill and Evans "started shouting." Hill wanted some money and took Evans' wallet away from him. Hill and Evans walked into the hallway and Evans "started fighting" with Hill. They "scuffled for a few minutes" and Hill "cut him several times [with a butcher knife] and shoved him into the *Page 423 
wall. And he got back up. When he got back up they — he [Hill] went to cutting him again, . . ." Herron "jumped up" off the sofa, grabbed Hill and "scuffled" with him for "a little while." Hill then went "through drawers and everything in the house." Over Hill's initial objection, Herron called the police. Herron testified that he wiped the blood out of Evans' face in an attempt to help him the "best he could."
Hill asked Herron to take him home. On the way, Herron asked him why he did it and Hill replied, "I don't know." During this time, Hill was coherent and was "sober".
Herron admitted having blood on his hands but denied having any on his clothes. He testified that several buttons were torn off his shirt when he was "scuffling" with Hill in the hallway to keep him from cutting Evans.
Herron testified that, when they arrived at Hill's apartment, Hill's actions did not change and Hill rolled a "joint" that Hill, Herron, Hill's wife and Townsend smoked. Herron admitted having Evans' hat in his car and stated that Evans had permitted him to wear the hat earlier in the day. Herron testified that he had picked up Evans' pocketknife when he was using the phone to call the police "because it was the only knife, . . . I could see in sight, and I didn't want anything else to happen." He denied having the hat in Hill's apartment and testified that he was not waving the knife around.
Herron denied taking Evans' radio or knowing anything about it, denied talking to Gwin Morgan, and stated that he "never made any statements to anybody about anything" that had happened at Miss Cooper's trailer. Herron testified that Hill's defense witnesses were lying about what occurred at Hill's apartment.
Both Hill and Herron testified that they did not kill Evans and each claimed that he did not contribute to his injuries.
The State's evidence proved that Herron, Hill and Evans were together at Evans' residence at 8:00 or 8:30 and at Miss Cooper's at 10:30 or 11:00 on the night of December 3, 1982; that someone notified the police at 12:26 A.M. that someone was bleeding at Evans' residence; that Herron and Hill traded Evans' radio for two marijuana cigarettes between 11:30 P.M. and 1:30 A.M.; that Hill and Herron were together at 1:00 or 2:00 A.M. when Herron had blood on his hands and was wearing Evans' cowboy hat and had Evans' pocketknife.
Hill's defense admitted that he, Herron and Evans were together at Evans' house at 3:30 P.M. and that, when he "woke up" at 12:30 A.M. outside Evans' house, Evans had been cut and Herron was standing over his body. Hill's witnesses confirmed the testimony of the State's witnesses of the events when Hill and Herron returned to Hill's apartment after Evans had been cut. Hill's evidence also showed that Herron, Hill and Evans were together at 11:00 P.M. and that Hill had passed out.
Herron was the only witness to directly implicate Hill in the murder of Evans, and Herron was the only eyewitness to testify to the killing.
The principles governing the issue of severance based on antagonistic defenses were stated in United States v. Haldeman,559 F.2d 31 (D.C. Cir. 1976), cert. denied sub nom., Ehrlichmanv. United States, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250
(1977). See also Annot., 82 A.L.R.3d 245 (1978).
 "While there are situations in which inconsistent defenses may support a motion for severance, the doctrine is a limited one. As set forth in Rhone v. United States, 125 U.S.App.D.C. 47, 48, 365 F.2d 980, 981 (1966), the governing standard requires the moving defendant to show that `the defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' Application of this standard, which is for the District Court in the first instance, and reviewable here only for abuse of discretion, requires that the accounts of co-defendants *Page 424 
be not merely divergent from one another but indeed `so contradictory as to raise an appreciable danger that the jury would convict solely on the basis of the inconsistency.' To warrant a severance, in short, the accounts of co-defendants must be `on a collision course.' United States v. Bolden, 169 U.S.App.D.C. 60, 69, 514 F.2d 1301, 1310 (1975)."
* * * * * *
 "`[T]he mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating another have both been held to be insufficient grounds to require separate trials.' United States v. Barber, 442 F.2d 517, 530 (3d Cir.), cert. denied, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971)." Haldeman, 559 F.2d at 71-72.
The decision whether to grant a severance, or order a joinder of defendants, lies within the broad discretion of the trial court. This Court will not overturn that decision absent an abuse of discretion. United States v. Webster, 734 F.2d 1048,1052 (5th Cir.), cert. denied sub nom., Hoskins v. UnitedStates, ___ U.S. ___, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). "In order to establish an abuse of discretion, the defendant must show that he `received an unfair trial and suffered compelling prejudice against which the trial court was unable to afford protection.' See U.S. v. Berkowitz, 662 F.2d [1127] at 1132 [(5th Cir.)]." Webster, 734 F.2d at 1052.
 "When codefendants allege antagonistic defenses as a ground for severance, this Court has applied very specific tests to determine whether the trial was unfair. To compel severance, the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. See, United States v. Berkowitz, 662 F.2d at 1133; United States v. Crawford, 581 F.2d [489] at 491 [(5th Cir.)]. The defenses must be so antagonistic that the jury, in order to believe the defense of one defendant, must necessarily disbelieve the other defendant's defenses. Id." Webster, 734 F.2d at 1053.
In this case, it is abundantly clear that the trial judge was correct when he initially denied the State's motion to join the defendants in a single trial. The defenses were not only hostile and antagonistic, they were also "mutually exclusive" and irreconcilable. If the jury believed Herron, then Hill must be guilty. If the jury believed Hill, then Herron must be guilty. Without Herron's testimony, there was only a slender thread of circumstantial evidence that Hill participated in Evans' murder. Without Herron's testimony, the jury might very well have concluded that Hill was, in fact, intoxicated and did not participate in the murder. With Herron's testimony, the jury had virtually no choice but to convict him. Herron's testimony confirmed the suspicion planted by the prosecution.
This case is a prime example of the classic statement of the unfairness produced by the joint trial of defendants with mutually exclusive and antagonistic defenses.
 "The trial was in many respects more of a contest between the defendants than between the people and the defendants. It produced a spectacle where the people frequently stood by and witnessed a combat in which the defendants attempted to destroy each other." People v. Braune, 363 Ill. 551, 557, 2 N.E.2d 839, 842 (1936).
"There is no more classic situation of the need for a severance than one in which two co-defendants each place the blame for a crime on the other." State v. Singleton, 352 So.2d 191, 192
(La. 1977). See also, R. Dawson, Joint Trials of Defendants inCriminal Cases: An Analysis of Efficiencies and Prejudices, 77 Mich.L.Rev. 1379, 1422-1426 (1979).
After balancing the inconvenience and expense to the state of separate trials and the prejudice to the defendants, this Court finds that the scales tip heavily in favor of defendant Hill. We note that the jury was never instructed "to individualize each defendant in his relation to the mass" or "to compartmentalize the evidence as it relates to separate defendants." C. Wright, Federal *Page 425 
Practice and Procedure Criminal 2d § 223 at 804 (1982).
We agree that, "antagonistic defenses do not per se require severance, even if the defendants are hostile or attempt to cast the blame on each other." United States v. Arruda,715 F.2d 671, 679 (1st Cir. 1983). "Antagonism of defenses requires severance only where the defenses are so inconsistent that the jury would have to believe one defendant at the expense of the other; the conflict alone establishes the guilt of a defendant." United States v. Drougas, 748 F.2d 8, 20 (1st Cir. 1984). "[S]everance is required because of `mutually antagonistic defenses' only when the defenses are so antagonistic that `the acceptance of one party's defense will preclude the acquittal of the other.'" United States v.Hendrix, 752 F.2d 1226, 1232 (7th Cir.), cert. denied sub nom.,Merritt v. United States, ___ U.S. ___, 105 S.Ct. 2032,85 L.Ed.2d 314 (1985).
The judgment of the circuit court is reversed and this cause is remanded for a new trial.
REVERSED AND REMANDED.
All Judges concur.