Cecil Nathan Herron was indicted for the murder of one Walter Luke Evans in violation of § 13A-6-2, Code of Alabama 1975. The appellant's case was consolidated for trial with co-defendant David Berry Hill. Following trial, the jury found the appellant "guilty as charged" in the indictment. The trial judge sentenced the appellant to 99 years in the penitentiary.
On the morning of December 3, 1982, Talmadge Townsend came to the trailer of Brenda Cooper. David Hill was with Townsend and he introduced Hill to Cooper. The two told Cooper they wanted to introduce her to a man. They said he would be good to her and she might get a car and some money from him. Cooper, who had been drinking, agreed. Townsend and Hill left and said they would return later.
That afternoon Hill returned to Cooper's trailer and was accompanied by the appellant, whom Cooper had never met. After talking for a time, the three drove in the appellant's car to the victim's home. Cooper *Page 426 
was introduced to the victim, and Hill and the appellant had a beer.
At some point, the appellant said to the victim, "Here is you a woman. Why don't you take her and go to bed with her." (R. 31). Cooper said no and continued talking to the victim. Soon all four of them left the victim's house to get some more beer. On the way they stopped at a gas station and the victim paid for gas for the appellant's car. They then proceeded to Madison County and bought some beer. The four rode around for a while and then appellant started saying he wanted to have an orgy. The appellant drove to Cooper's trailer and the four went in.
The appellant kept talking about an orgy and Cooper asked him and Hill to leave. The appellant, Herron, then pulled Cooper into her bedroom and told her to take off her clothes. When she resisted, he ripped off her clothes. The appellant also took off the victim's pants. Hill and the appellant then undressed.
Cooper then suggested they have another beer. The appellant and Hill left the room. Cooper told the victim to get dressed and she'd get him home. When Cooper went into the bathroom to get dressed she heard a loud noise. Her ex-boyfriend, Tom Cremeans, then came in the room. Cooper heard the victim and Cremeans fighting.
After Cooper got dressed, she went outside and the appellant, Hill, the victim and Cremeans were gone. A short while later Cremeans called Cooper on the phone. She met Cremeans and he took her to his trailer.
Thomas Cremeans stated that he had moved out of Cooper's trailer a few days before December 3, 1982. On that night Cremeans drove to Cooper's trailer. When he arrived he saw a car parked outside with two men sitting in it. The door to Cooper's trailer was open so he went inside. Once inside, he saw a man in the trailer and Cooper in the bathroom. Cremeans told the man to leave and the man replied that he did not have to go. The two started scuffling and Cremeans pushed the man out the door of the trailer. The man got in the car parked outside and Cremeans closed the door to the trailer.
Cremeans then saw the driver of the car with a 2 x 4 board. He heard a noise and saw that his car window had been broken.
After the car left, Cremeans walked outside and the man who owned the trailer park told him to leave. Cremeans left the trailer park, drove to a nearby store and called Cooper. He told her he was going to pick her up because he was scared of what those men might do. After he picked up Cooper, Cremeans drove back to his trailer.
Hershell Edward Nix testified that on December 3, 1982 he owned the Thornton Trailer Park where Cooper lived. On that night, he was awakened by the sound of breaking glass. He looked outside his trailer and saw someone with a stick. Nix then received a call from one of Cooper's neighbors who told him there was a fight going on in Cooper's trailer.
When Nix got to Cooper's trailer, he saw someone helping the victim, whom he knew, into a car. There were two other men in the car and Nix was able to identify Hill as one of the occupants. Nix told Cremeans to leave the trailer park and then went to the door of Cooper's trailer. Cooper was intoxicated and naked. Nix told her to get her trailer out of the park, and he went home. Nix stated he didn't see anybody with a knife nor any blood when he got to Cooper's trailer.
Sometime between the hours of 11:30 on the night of December 3, 1982 and 1:30 in the morning of December 4, 1982, Kenneth Driskell was driving by the Happy People's Club when he heard the appellant blow his horn at him. Driskell pulled into Happy People's Club parking lot and the appellant pulled in next to him. Hill was in the car with the appellant.
The appellant showed Driskell a radio and told him he wanted to sell it. Driskell replied he didn't have any money. The appellant then asked where he could obtain some marijuana. Driskell told him he could roll him a joint. The appellant *Page 427 
agreed and Driskell rolled a joint and gave it to the appellant.
The appellant said he'd swap the radio for another joint. Driskell replied that he'd have to go home and roll him another one. The appellant then gave Driskell the radio.
At some point, the appellant got out of the car and said, "See what I got? Man, this is sharp, ain't it?" The appellant was referring to a cowboy hat. The appellant then followed Driskell to his house and Driskell gave him another joint. The police came and got the radio a few days later.
Richard Crowell testified that he was the radio dispatcher for the Decatur Police Department on the morning of December 4, 1982. At 12:26 a.m., a male called and said someone was hurt and bleeding at 1802 Summerlane. The caller said something about Walter Evans but Crowell was unable to understand him. Crowell then dispatched Coker and Burleson to the scene.
When the officers arrived at 1802 Summerlane, they knocked on the door but did not get an answer. The front door was locked but the back door was open. The officers entered and called for Evans but did not get a response. Moaning sounds were heard and the officers went into the back bedroom and found the victim on the floor with blood around him.
The paramedics arrived and transported the victim to the hospital. The officers secured the scene and notified Detective John Boyd.
Dr. Edward Benak testified that he was working in the Emergency Room at Decatur General Hospital on December 4, 1982 when the victim was brought in. Benak said the victim had sustained blunt force trauma to the head, had lacerations on his face and a puncture wound to the neck. There were also numerous bruises, cuts and abrasions on his body. Benak then alerted the general surgeon.
Lisa Ann Hill testified that she was married to David Hill on December 3, 1982. During that afternoon Hill told her that the victim wanted to meet this woman and he and the appellant were going to introduce them. Hill and the appellant then left Hill's house.
At approximately 8:00 that night, Lisa Hill called the victim's home. The victim answered and Lisa Hill then talked to her husband. She could hear the appellant and a woman talking in the background.
Between 1:00 and 2:00 on the morning of December 4, 1982 Hill and the appellant came to Hill's house. Lisa Hill was there along with Townsend, Sue Smith (David Hill's sister) and Thelma Carter (David Hill's mother). When the two came in, the appellant had blood on his hand and Hill looked like he was in shock. The appellant said that he and Hill had taken the victim to this lady's house and the victim had gotten in a fight with her ex-boyfriend. The appellant said he had to pull the lady's ex-boyfriend off the victim.
The appellant then went and washed his hands. When he came back out he pulled out an Old Timer's pocket knife. Lisa Hill recognized the knife as the one the victim carried. The appellant asked if anybody needed a pocket knife. The appellant was wearing a cowboy hat that Lisa Hill remembered as belonging to the victim.
Lisa Hill tried to talk to her husband and he said that he had never seen so much blood. When Lisa Hill asked what he meant Hill replied, "Mr. Evans." (R. 112). Lisa Hill then asked what was wrong with Mr. Evans. Hill said that he and the appellant went over to the victim's house and knocked on the door. When they didn't get an answer, they went inside and saw puddles of blood in the hallway. The victim, Evans, was found in the bedroom. After they found the victim, they called an ambulance and left. Hill said he didn't know who had cut the victim.
Lisa Hill said her husband came home that night with only his pants on. He had left the house fully dressed but came home without his shirt, shoes and belt. These items were recovered the next day from Cooper's trailer. Lisa Hill stated that she did not see any blood on Hill that night. She said her husband had a drinking problem *Page 428 
at this time and was drunk when he came home on December 4, 1982.
The appellant tried to get Hill to go to Birmingham with him but Thelma Carter made him leave. He left with the pocket knife.
Detective John Boyd arrived at the victim's house at 1:06 a.m. and found the house in total disarray. In the kitchen the victim's wallet was lying on the floor with cards strewn about. The cabinet doors and drawers were open. There were drops of blood in the kitchen. On the kitchen counter was a pad of paper with the appellant's name and phone number.
In the den the gun cabinet had been pulled from the wall and its doors were open. It contained no guns. Lamps were turned over and papers were scattered.
There was blood on the floor and walls in the hallway. In one bedroom, Boyd found a butcher knife on an ironing board. The knife had blood on it. There were also blood spots in the bedroom.
In the bedroom where the victim was found, the contents of the room were scattered about. The mattress was on the floor as well as numerous articles of clothing. Blood was on the closet door and the floor. Boyd found a shirt and long underwear in the bedroom. Both of these articles had blood on them. He also recovered several buttons from the floor.
The next day Boyd obtained a jacket, a pair of jeans, a shirt, a cowboy hat and an Old Timer's pocket knife from the appellant's parents.
Dr. Josefino C. Aguilar, a forensic pathologist with the Department of Forensic Sciences, performed the autopsy on the victim's body. Aguilar found several cut wounds and numerous abrasions to the body. He determined that the cause of death was a cut wound to the neck made by a sharp-pointed, single-edged instrument.
Roger Morrison, a forensic scientist with the Department of Forensic Sciences, received a sample of the victim's blood from Aguilar. The victim's blood was Type A. He examined the shirt found in the master bedroom of the victim's house. The shirt had bloodstains which were found to be Type A. The shirt also had numerous cuts in it and a large cut near the collar in the back of the shirt. The jacket obtained from the appellant's parents also had Type A bloodstains.
Morrison found human bloodstains on the butcher knife found at the scene but was unable to determine the blood type of the stains on this. There was no blood or tissue found on the Old Timer's pocket knife. Morrison was unable to find bloodstains on Hill's jeans or the jeans and shirt obtained from the appellant's parents.
John Kilbourne, also a Department of Forensic Sciences scientist, stated that the buttons from the shirt, found in the victim's bedroom, appeared to have been forcibly removed. He also noted that the shirt obtained from the appellant's parents was missing four buttons. A thread on one of the buttons found at the scene was similar to the thread used to attach the buttons to this shirt. A few of the buttons found at the scene were also similar to the buttons which remained on the shirt.
Beth Evans, the victim's daughter, testified that she gave her father a Panasonic radio for his birthday. Her brother, Stan Evans, stated that the radio was not found at the victim's house.
John Boyd testified that he obtained a radio from Driskell. The model number of the radio was the same as the one contained on a box in the victim's house.
Ruby Herron, the appellant's mother, stated that she had washed the appellant's jeans and shirt before she gave them to Boyd. She noticed several buttons were missing from the shirt. Herron stated that the jacket she gave to Boyd did not belong to the appellant and she found it in his car. She noticed it had blood on it.
Hill's mother and sister both testified and their testimonies were similar to that given by Lisa Hill. However, both said they saw blood on the appellant's shirt.
Townsend also testified similarly. *Page 429 
Gevin Morgan testified that she saw the appellant, Hill, and an older man in appellant's car at approximately 11:00 p.m. on December 3, 1982. The older man asked if she wanted to go riding around. Morgan later saw only the appellant and Hill driving around.
David Hill testified that he went with Townsend to Cooper's house on the morning of December 3, 1982 to fix Cooper up with the victim. After they left Cooper's, Hill went home and the appellant came over. The two went riding around and Hill told the appellant about Cooper and the victim. The appellant wanted to go over to the victim's house and suggested they take Cooper.
After picking up Cooper they went to the victim's house. After talking for a while, the four went for a drive to get some beer. They stopped for gas and the victim filled up the appellant's car.
Hill stated he had been drinking beer and smoking pot all day. He said he didn't remember anything else until that night when he woke up in the appellant's car outside the victim's house. Hill heard a scuffle in the house and went inside. Once inside he saw blood in the hallway. He found the appellant with the Old Timer's knife in his hand standing over the victim, Evans.
Hill asked the appellant what had happened and the appellant told him that Cooper's boyfriend had followed them to the victim's house. Hill told the appellant to call an ambulance, which he did. Hill said, after he and the appellant left the victim's (Evans) house, he does not remember anything else until the next morning. He does recall, at some point during the night, waking up and hearing the appellant ask the victim for money.
The appellant testified that, when he and Hill went to Cooper's trailer, they smoked pot and drank beer. Cooper and Hill talked about how they were going to get money from the victim, Evans. He stated that after picking up the victim he, Hill, the victim and Cooper drove to Madison to get some beer. He said the victim bought the beer while he and Hill went to the bathroom. After getting the beer, the four went to Cooper's trailer. All four of them went into the bedroom and Hill and Cooper attempted to have sex while he and the victim, Evans, watched television.
At some point the appellant heard a car pull up outside. The appellant walked outside. A man went in the trailer and jumped on the victim and threw him outside. The appellant then got a stick out of his car and broke the man's windshield because he wanted to fight him. Hill got out of the back of Cooper's trailer with only his jeans on.
The appellant, Hill and the victim got in the car and went back to the victim's house. The appellant watched television while the victim and Hill talked in the kitchen. At some point Hill and the victim started shouting. He heard Hill ask the victim for money and the victim replied that he didn't have any. Hill started going through the victim's wallet and then the two started fighting in the hallway.
The appellant saw Hill cut the victim, Evans, numerous times with the butcher knife. The appellant then started scuffling with Hill and Hill tore the buttons off his shirt. Hill took the victim into the bedroom while the appellant called the police.
The appellant then went into the bedroom and wiped the blood off the victim's face with the long underwear. He then went outside and Hill said he wanted to go home. The appellant asked Hill "why he did it" and Hill replied that he didn't know why. (R. 406). The appellant then took Hill home.
The appellant stated that he got the victim's Old Timer's pocket knife when he called the police. He said Hill picked up the radio when they left. He said he had the cowboy hat because the victim let him wear it earlier. The appellant stated he didn't know how the jacket got blood on it and denied there was blood on his shirt. He admitted to several inconsistencies between his statement and his testimony. The appellant denied seeing Morgan on the night of December 3, 1982 and said that he did not trade the radio for pot. The appellant *Page 430 
testified that he did not kill Evans or contribute to his death in any way.
 I
The appellant, Herron, claims that he did not receive a fair trial because his case was improperly consolidated for trial with the case of his co-defendant, Hill. Herron maintains that their defenses were antagonistic and mutually exclusive.
Herron was the only witness to directly implicate Hill in the murder of Evans and Herron was the only eyewitness to testify to the killing.
As stated by this court through Presiding Judge Bowen inHill, 481 So.2d 419 (Ala.Crim.App. 1985), the co-defendant's case:
 "The principles governing the issue of severance based on antagonistic defenses were stated in United States v. Haldeman, 559 F.2d 31 (D.C. Cir. 1976), cert. denied sub nom., Ehrlichman v. United States, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). See also Annot., 82 A.L.R.3d 245 (1978).
 "`While there are situations in which inconsistent defenses may support a motion for severance, the doctrine is a limited one. As set forth in Rhone v. United States, 125 U.S.App.D.C. 47, 48, 365 F.2d 980, 981 (1966), the governing standard requires the moving defendant to show that "the defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." Application of this standard, which is for the District Court in the first instance, and reviewable here only for abuse of discretion, requires that the accounts of co-defendants be not merely divergent from one another but indeed "so contradictory as to raise an appreciable danger that the jury would convict solely on the basis of the inconsistency." To warrant a severance, in short, the accounts of co-defendants must be "on a collision course." United States v. Bolden, 169 U.S.App.D.C. 60, 69, 514 F.2d 1301, 1310 (1975). "* * *
 "`"[T]he mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating another have both been held to be insufficient grounds to require separate trials." United States v. Barber, 442 F.2d 517, 530 (3d Cir.), cert. denied, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971).' Haldeman, 559 F.2d at 71-72.
 "The decision whether to grant a severance, or order a joinder of defendants, lies within the broad discretion of the trial court. This Court will not overturn that decision absent an abuse of discretion. United States v. Webster, 734 F.2d 1048, 1052 (5th Cir.), cert. denied sub nom., Hoskins v. United States, ___ U.S. ___, 105 S.Ct. 565, 83 L.Ed.2d 506
(1984). `In order to establish an abuse of discretion, the defendant must show that he "received an unfair trial and suffered compelling prejudice against which the trial court was unable to afford protection." See U.S. v. Berkowitz, 662 F.2d [1127] at 1132 [(5th Cir. 1981)].' Webster, 734 F.2d at 1052.
 "`When codefendants allege antagonistic defenses a ground for severance, this Court has applied very specific tests to determine whether the trial was unfair. To compel severance, the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. See, United States v. Berkowitz, 662 F.2d at 1133; United States v. Crawford, 581 F.2d [489] at 491 [(5th Cir. 1978)]. The defenses must be so antagonistic that the jury, in order to believe the defense of one defendant, must necessarily disbelieve the other defendant's defenses. Id.' Webster, 734 F.2d at 1053."
As noted by this court in Hill, supra, the defenses in the two cases were not only hostile and antagonistic, they were also "mutually exclusive" and irreconcilable.
Further, as noted by this court, through Judge Bowen in Hill:
 "If the jury believed Herron, then Hill must be guilty. If the jury believed Hill, then Herron must be guilty. Without Herron's testimony, there was only a *Page 431 
slender thread of circumstantial evidence that Hill participated in Evans' murder. Without Herron's testimony, the jury might very well have concluded that Hill was, in fact, intoxicated and did not participate in the murder. With Herron's testimony, the jury had virtually no choice but to convict him. Herron's testimony confirmed the suspicion planted by the prosecution."
This case is another classic example of the unfairness produced by joint trial of defendants with mutually exclusive antagonistic defenses.
Further, as noted in Hill, supra:
 "`There is no more classic situation of the need for a severance than one in which two co-defendants each place the blame for a crime on the other.' State v. Singleton, 352 So.2d 191, 192 (La. 1977). See also, R. Dawson, Joint Trials of Defendants in Criminal Cases: An Analysis of Efficiencies and Prejudices, 77 Mich.L.Rev. 1379, 1422-1426 (1979)."
On authority of Hill, supra, the judgment of the circuit court is, hereby, reversed and this cause is remanded for new trial.
REVERSED AND REMANDED.
All the Judges concur.