[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 482 
The appellants, Ronald Weaver and Morris Lawson, were convicted of robbery in the first degree. Weaver was sentenced to 20 years' imprisonment, and Lawson was sentenced to 21 years' imprisonment. We address the issues raised by each appellant separately.
 ISSUES RAISED BY WEAVER I.
Weaver first contends that the trial court erred in consolidating his case with Lawson's case. Specifically, Weaver argues that the joint trial prejudiced him and that, therefore, his conviction should be reversed.
Rule 13.3, Ala.R.Crim.P., provides for the consolidation of defendants for trial. Rule 13.3(c) states, in pertinent part:
 "If offenses or defendants are charged in separate indictments, informations, or complaints, the court on its own initiative or on motion of either party may order that the charges be tried together or that the defendants be joined for the purposes of trial if the offenses or the defendants, as the case may be, could have been joined in a single indictment, information, or complaint."
Rule 13.3(b), Ala.R.Crim.P., provides, in pertinent part:
 "Two or more defendants may be charged in the same indictment, information, or complaint:
 "(1) If they are alleged to have participated in the same act or transaction; or
 "(2) When the several offenses are part of a common conspiracy, scheme, or plan; or
 "(3) When the several offenses are otherwise so closely connected that it would be difficult to separate proof of one from proof of the other."
The test for determining whether a trial court erred in consolidating criminal defendants for trial is whether the defenses presented by one defendant were so "antagonistic that [the defenses] are 'irreconcilable and mutually exclusive' and 'the jury, in order *Page 483 
to believe one defendant, must necessarily disbelieve the other defendant's defenses.' " Hill v. State, 481 So.2d 419, 424
(Ala.Cr.App. 1985).
 " ' "Even if defendants attempt to cast blame on each other, severance is not necessarily required." . . . "The burden is on defendants to show that an antagonistic defense would present a conflict 'so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' " ' "
Jones v. State, 672 So.2d 1366, 1370 (Ala.Cr.App. 1995) (citations omitted).
The trial court is allowed much discretion in deciding whether to consolidate cases, and this court will not overturn its decision absent an abuse of discretion by the court.Curry v. State, 601 So.2d 157, 160 (Ala.Cr.App. 1992); Gladdenv. State, 551 So.2d 1141 (Ala.Cr.App. 1989). In order to show an abuse of discretion, the appellant must show that consolidation resulted in an unfair trial and that the appellant " 'suffered compelling prejudice against which the trial court was unable to afford protection.' " Curry, 601 So.2d at 160 (quotingUnited States v. Webster, 734 F.2d 1048, 1052 (5th Cir.), cert. denied sub nom., Hoskins v. United States, 469 U.S. 1073,105 S.Ct. 565, 83 L.Ed.2d 506 (1984)).
In the instant case, the offenses charged against Weaver and Lawson in the separate indictments arose out of the same incident: the armed robbery of the Subway sandwich restaurant in Birmingham on April 13, 1993. The state's evidence tended to show the following. Lawson entered the restaurant with a gun, pointed the gun at an employee's head, and demanded the restaurant's money. The employee gave Lawson the money. Weaver did not enter the restaurant, but instead drove the getaway car as a part of the planned robbery. Weaver's defense at trial was that, although he was in his car in the area of the robbery when the robbery occurred, he had no knowledge of the robbery or of Lawson's intent to commit the robbery. Lawson's defense was essentially that he was not present near the robbery scene and that he, therefore, was not a participant in the robbery. After reviewing the evidence, we do not believe that the defenses of Weaver and Lawson were "irreconcilable and mutually exclusive" so as to preclude a joint trial.
Donna Thomas testified at trial that at around noon on April 13, 1993, she saw a black male running near the Subway restaurant, carrying a handgun and a clear plastic Subway bag filled with money. Thomas followed the individual for a short distance in her automobile and saw him get in the passenger side of a car being driven by someone else.[1] The car took off at a high rate of speed, as if, according to Thomas, its occupants were attempting to "get away." Thomas took down the car's tag number and gave it to police. Ownership of the car was traced to Weaver. Weaver's post-arrest statement to police, wherein he acknowledged that he was driving his car near the Subway at the time of the robbery, was admitted in evidence at trial. However, Weaver denied in the statement that he had participated in the robbery in any way. Any references to Lawson in Weaver's statement were removed before the statement was allowed to be presented to the jury.
Lawson gave a post-arrest statement to police in which he admitted committing the robbery. Lawson's statement was admitted in evidence at trial over his objection. The statement did not implicate Weaver as a participant in the robbery and, in fact, did not even mention Weaver. At trial, Lawson's counsel, in cross-examining Kim Sullivan, a Subway employee who was in the restaurant during the robbery, elicited evidence that Sullivan had identified Weaver in a police photographic lineup as the gunman who had entered the restaurant during the robbery. In court, Sullivan could not identify Weaver or Lawson as the gunman. A fair reading of the record suggests that evidence of Sullivan's identification of Weaver in the photographic lineup was more valuable to *Page 484 
Lawson than it was harmful to Weaver, because it was never the state's position that Weaver was present inside the restaurant and Lawson's defense was that he was not a participant in the robbery and that he had not been near the robbery scene. Lawson's counsel never explicitly sought to accuse Weaver of being the actual gunman inside the restaurant,[2] and the thrust of counsel's cross-examination of Sullivan concerning the photographic lineup was to exculpate Lawson rather than to accuse Weaver of being the gunman.
Weaver's defense, then, was not irreconcilable with Lawson's. As the state correctly argues in its brief to this court, the jury could believe that Weaver did not know about the robbery and could also believe that Lawson was not present at the robbery. Weaver has failed to show that he suffered "compelling prejudice" as a result of consolidation. No abuse of discretion is evident in this matter.
 II.
Weaver also contends that the trial court erred in allowing a state's witness, Officer Charlie Johnson, a Birmingham police officer and one of the lead investigators in the case, to remain in the courtroom during testimony of other witnesses despite Weaver's requested invocation of "the rule" excluding potential witnesses from the courtroom.
Rule 9.3(a), Ala.R.Crim.P., authorizes the trial court to exclude potential witnesses from the courtroom prior to or during proceedings. The Committee Comments to Rule 9.3(a) state that "[t]he power to exclude and separate witnesses is entirely a matter of discretion with the trial court." The Comments citeTeague v. State, 245 Ala. 339, 16 So.2d 877 (1944); and Beddowv. State, 39 Ala. App. 29, 96 So.2d 175 (1956), cert. denied,266 Ala. 694, 96 So.2d 178 (1957), cert. denied, 355 U.S. 930,78 S.Ct. 412, 2 L.Ed.2d 414 (1958). " '[I]nvestigators or police officers commonly are exempted from the rule.' J. Colquitt, Alabama Law of Evidence § 6.15 at 333 (1990). See also C. Gamble, McElroy's Alabama Evidence § 286.01 (4th ed. 1991). See also Rule 9.3, Ala.R.Crim.P." Taylor v. State,666 So.2d 36, 66 (Ala.Cr.App. 1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856
(1996). "Alabama appellate courts have time and again refused to hold it an abuse of discretion on the part of a trial court to allow a sheriff, police chief, or similarly situated person who will later testify to remain in the courtroom during trial." Ex parte Lawhorn, 581 So.2d 1179, 1181 (Ala.), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991) (citing several Alabama cases holding to same effect).
Weaver does not present any convincing argument that the trial court abused its discretion by exempting the law enforcement officer from "the rule" and allowing him to remain in the courtroom during the testimony of other witnesses. We find no reversible error in this regard.
For the reasons stated above, we affirm the judgment of the trial court as to Weaver's conviction.
 ISSUES RAISED BY LAWSON III.
Lawson, who was 16 years old at the time of the offense, contends that his statement to police should have been suppressed because, he says, it was obtained after he requested to see his parents and he was not allowed to see them before making the statement. Rule 11(B), Ala.R.Juv.P.,[3] enumerates the rights of a child who is in custody but has not yet *Page 485 
been questioned (the so-called "super-Miranda" rights). It provides as follows:
 "Before the child is questioned about anything concerning the charge on which the child was arrested, the person asking the questions must inform the child of the following rights:
"(1) That the child has the right to counsel;
 "(2) That if the child is unable to pay a lawyer and if the child's parents or guardian have not provided a lawyer, one can be provided;
 "(3) That the child is not required to say anything and that anything the child says may be used against the child;
 "(4) That if the child's counsel, parent, or guardian is not present, then the child has a right to communicate with them, and that, if necessary, reasonable means will be provided for the child to do so."
Subsections (1), (2), and (3) of Rule 11(B) are "substantially the same as the warnings required in Miranda v.Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)."Ex parte Whisenant, 466 So.2d 1006, 1007 (Ala. 1985). "In addition to the standard Miranda warnings, [subsection (4) mandates that] a juvenile must also be informed that he can communicate with a parent or guardian." Ex parte Whisenant, 466 So.2d at 1011 (Torbert, C.J., concurring in pertinent part). This Court has recognized the importance of affording children the additional right in Rule 11(B)(4), stating:
 "Informing the child of his right to communicate with a parent or guardian serves two important purposes. First, '[t]his simple warning will give the juvenile the opportunity to obtain the guidance necessary in order for him to evaluate his rights.' Ex parte Whisenant, 466 So.2d at 1012. (Torbert, C.J., concurring in pertinent part). Secondly, the rule recognizes that 'the parent or guardian may be the conduit through which the juvenile secures an attorney.' Id."
Payne v. State, 487 So.2d 256, 259 (Ala.Cr.App. 1986), quoted inL.J.V. v. State, 545 So.2d 240, 245 (Ala.Cr.App. 1989).
 " 'The rationale of courts holding a child's request to see a parent equivalent to a request to see an attorney, . . . is that, while an adult in trouble normally requests an attorney's assistance, a child logically expresses his desire for help and his unwillingness to proceed alone by requesting a parent's presence. . . . [I]n the case of a child, the right to assistance of counsel is hollow unless a parent is present, for a parent is normally the child's only avenue through which to evaluate and exercise the right to counsel.'
 "[Samuel M. Davis, Rights of Juveniles § 3.13 at 3-64.5 (2d ed. 1991)]."
E.C. v. State, 623 So.2d 364, 368 (Ala.Cr.App. 1992).
In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880,68 L.Ed.2d 378 (1981), the United States Supreme Court held that when an accused asserts his rights to counsel during custodial interrogation, further questioning by the police must cease until counsel has been made available, unless the accused initiates further conversation with the police. See Coral v.State, 628 So.2d 954, 973 (Ala.Cr.App. 1992), aff'd,628 So.2d 1004 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387,128 L.Ed.2d 61 (1994). If the accused makes a statement after the right to counsel has been invoked but before counsel is provided, the prosecution, in order to admit the statement at trial, must show (1) that the accused initiated the later communication with the police and (2) that the accused knowingly, intelligently, and voluntarily waived his previously asserted right to counsel. Oregon v. Bradshaw, 462 U.S. 1039,103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). See Hutcherson v. State,677 So.2d 1174 (Ala.Cr.App. 1994), rev'd on other grounds,677 So.2d 1205 (Ala. 1996); Gilchrist v. State, 585 So.2d 165
(Ala.Cr.App. 1991).
In E.C., supra, this court stated:
 "Invocation of the juvenile right to parental communication is governed by the same standard as invocation of the Miranda right to counsel. See L.J.V. v. State, 545 So.2d 240 (Ala.Cr.App. 1989). 'Analogously to the right to see counsel, if a juvenile indicates, in any manner, that he *Page 486 
wishes to talk to a parent, the interrogation must immediately cease.' L.J.V. v. State, 545 So.2d at 245. See also Smith v. State, 484 So.2d 560, 561."
623 So.2d at 367.
The uncontroverted facts relevant to Lawson's claim are these: On July 13, 1993, Lawson was arrested and taken into custody by the Birmingham Police for questioning concerning two separate and unrelated crimes: a shooting, which had occurred the previous day and for which Lawson was later charged with attempted murder, and the April 1993 robbery of the Subway restaurant, which is the offense at issue in this appeal. At the time of his arrest, Lawson was a juvenile. Lawson was transported by patrol car to the police station by Birmingham Police Officer Norman Anchrum, who read Lawson his juvenileMiranda rights, including those contained in subsection (4) of Rule 11(B), Ala.R.Juv.P., before delivering Lawson to the police station. Shortly after his arrival at the police station, Lawson was turned over for questioning to Sergeant Eugene Thomas, who was investigating the attempted murder case in which Lawson was a suspect. It is undisputed that before Sergeant Thomas began to question Lawson concerning the attempted murder, Lawson asked Sergeant Thomas to contact his parents. Sergeant Thomas attempted to reach Lawson's parents by telephone three times during a period of 5 to 10 minutes, but was unsuccessful. He then told Lawson that he had been unable to reach his parents. It appears from the record that immediately thereafter and without further comment by Lawson on the subject of contacting either his parents or an attorney, Sergeant Thomas provided Lawson with a printed waiver of juvenile Miranda rights, read the contents of the form to Lawson, and watched as Lawson signed the form. Sergeant Thomas then questioned Lawson for approximately 20 minutes concerning the attempted murder. This interview was recorded on audiotape. Soon after this interview ended, Sergeant Thomas escorted Lawson across the hall to the office of Officer Charlie Johnson for questioning regarding the Subway robbery. Although there was conflicting testimony on this issue, it appears that Sergeant Thomas may have again read Lawson his juvenile Miranda
rights in Officer Johnson's office. Officer Johnson began to interview Lawson concerning the robbery shortly thereafter. During this interview, Lawson admitted that he had robbed the Subway restaurant "to get money to purchase guns." (R. 561.) Officer Johnson wrote down the substance of Lawson's confession, and that confession was admitted in evidence at Lawson's trial through testimony by Officer Johnson.
Rule 11(B)(4), which gives a juvenile the right to communicate with his or her parents upon request, "would be meaningless if the juvenile is not allowed to exercise that right." L.J.V., supra, 545 So.2d at 245. When Lawson requested that his parents be contacted, he invoked his right to communicate with his parents. We do not agree with the state's argument that the evidence showed only that Lawson requested that his parents be notified — not that Lawson requested to communicate with them. The state urges a hypertechnical interpretation of the testimony that Lawson told Sergeant Thomas that he wished his parents to be "contacted" and maintains that Lawson did not expressly state that he wished totalk to his parents. However, we find conclusive testimony that Lawson requested to communicate with his parents in the following testimony of Sergeant Thomas:
 "[Lawson's counsel]: But Mr. Lawson did tell you when you were taking his statement that he wanted to talk to his Mom or Dad, no, talk to his parents, that was his quote?
 "[Sergeant Thomas]: I told him I had tried to contact his mother, but I couldn't reach her on the phone.
 "[Lawson's counsel]: Okay. But my question is: Isn't it true that Morris Lawson asked you during your interrogation to contact his parents, he wanted to talk to his parents?
 "[Sergeant Thomas]: I told him I had, and I couldn't get in touch with them.
 "[Lawson's counsel]: But he asked you that, yes or no? *Page 487 
"[Sergeant Thomas]: Yes, he did."
(R. 90-91.) (Emphasis added.)
After Lawson invoked his right to communicate with his parents, interrogation should have ceased until Lawson had an opportunity to speak with his parents. However, the record reflects that instead of stopping the interrogation, Sergeant Thomas furnished Lawson with a waiver of juvenileMiranda rights form, read the contents of the form to Lawson, and got Lawson to sign the form. Immediately after Sergeant Thomas concluded his interview with Lawson regarding the attempted murder case, Lawson was taken to Officer Johnson's office, where, after being readvised of his juvenile Miranda
rights, Lawson was questioned concerning the robbery and confessed to committing it.
Although the record reflects that Lawson was twice advised of his juvenile Miranda rights after he requested that his parents be contacted and before giving his confession and further reflects that Lawson even signed a waiver of rights form during this time, it cannot fairly be said either that questioning stopped or that Lawson initiated further communication with the police after he had invoked his right to communicate with his parents. A valid waiver of a Miranda right cannot be established by showing merely that the accused responded to police-initiated interrogation even after being advised of his rights. Edwards v. Arizona, 451 U.S. at 484, 101 S.Ct. at 1885; see Fortier v. State, 515 So.2d 101, 110
(Ala.Cr.App. 1987), cert. denied, 484 U.S. 1043, 108 S.Ct. 776,98 L.Ed.2d 862 (1988).
In Oregon v. Bradshaw, supra, the United States Supreme Court discussed the meaning of the word "initiate" as it was used in the context of Miranda rights in Edwards v. Arizona. The Court stated:
 "While we doubt that it would be desirable to build a superstructure of legal refinements around the word 'initiate' in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to 'initiate' any inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation."
462 U.S. at 1045-46, 103 S.Ct. at 2835.
In Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093,100 L.Ed.2d 704 (1988), the Supreme Court expounded upon Edwards, stating:
 "The rule of the Edwards case came as a corollary to Miranda's admonition that '[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present.' 384 U.S. at 474[, 86 S.Ct. at 1627-1628]. In such an instance, we had concluded in Miranda, '[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden
rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' Id., at 474[, 86 S.Ct. at 1628]. In Edwards, we 'reconfirm[ed] these views and, to lend them substance, we emphasize[d] that it is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel.' 451 U.S. at 485[, 101 S.Ct. at 1885]. We concluded that reinterrogation may only occur if 'the accused himself initiates further communication, exchanges, or conversations with the police.' Ibid. Thus, the prophylactic protections that the Miranda warnings provide to counteract the 'inherently compelling pressures' of custodial interrogation and to 'permit a full opportunity to exercise the privilege against self-incrimination,' 384 U.S. at 467[, 86 S.Ct. at 1624], are implemented by the application of the Edwards corollary that if the suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect." *Page 488 
486 U.S. at 680-81, 108 S.Ct. at 2097-98 (some emphasis added; some emphasis in original).
Even though Lawson confessed to committing the robbery in the latter of two interrogations and even thought the later interrogation concerned a crime wholly unrelated to the attempted murder charge being investigated by Sergeant Thomas, to whom Lawson expressed his desire to communicate with his parents, Lawson's invocation of that right and the state's knowledge of that invocation is imputed from Sergeant Thomas to Officer Johnson, to whom Lawson gave his confession. "The state's knowledge is imputed from one state actor to another."Coral, supra, 628 So.2d at 973. See Arizona v. Roberson,486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704; Arthur v. State,575 So.2d 1165, 1172 (Ala.Cr.App. 1990), cert. denied,575 So.2d 1191 (Ala. 1991).
For the reasons stated above, Lawson's confession to Officer Johnson should not have been admitted into evidence at trial, and its receipt into evidence was error.
Although we have held that Lawson's confession was wrongfully admitted into evidence, our analysis does not end. The question becomes: Was the receipt of the confession into evidence harmless error? See Coral, 628 So.2d at 973; Smith v. State,623 So.2d 369, 372 (Ala.Cr.App. 1992), cert. denied,510 U.S. 1030, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993). "In order for a constitutional error to be deemed harmless under Chapman [v.California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)], the state must prove beyond a reasonable doubt that the error did not contribute to the verdict. In order for the error to be deemed harmless under Rule 45[, Ala.R.App.P.], the state must establish that the error did not injuriously affect the appellant's substantial rights." Coral, 628 So.2d at 973.
In this case, Lawson's confession to Officer Johnson was the strongest evidence connecting Lawson to the robbery. Donna Thomas, who was near the Subway restaurant shortly after the robbery, could not identify Lawson as the individual she saw running from the robbery scene carrying a gun and a clear plastic Subway bag filled with money. All references to Lawson in Weaver's post-arrest statement to police were removed before the jury was allowed to hear the statement. None of the restaurant employees who were present during the robbery could identify Lawson as the robber. One restaurant employee, Orlando Jackson, testified that the robber looked like someone he knew in grade school (about six years earlier) named Morris Lawson, but Jackson could not positively identify Lawson as the robber. Apart from Lawson's confession, the strongest evidence linking Lawson to the robbery was the testimony of Charlie Mae Allen, an acquaintance of Lawson's, who testified that more than a month after the robbery, she had heard Lawson boasting of participating in the robbery of a Subway restaurant. Allen also testified that on the day of the robbery, she saw Lawson and Weaver together and overheard a conversation between them in which Lawson was talking about an incident that had gone down "smooth" and telling Weaver that "[I] scared the hell out of [you]" during the incident. (R. 438-39.) Allen stated that Lawson had "a wad of money" including some $20 bills in a brown paper sack at this time. She also stated that Weaver appeared very nervous on this occasion.
Although Allen's testimony certainly incriminated Lawson, it is reasonable to assume that a jury would be considerably influenced toward believing Lawson's guilt, if not convinced of Lawson's guilt, after hearing a police officer testify that Lawson had confessed to him that he committed the crime. We will not say that the error in admitting Lawson's confession was harmless beyond a reasonable doubt. Therefore, Lawson's conviction is due to be reversed, and the case as it relates to Lawson is remanded to the trial court for proceedings consistent with this opinion.
AS TO WEAVER — AFFIRMED.
AS TO LAWSON — REVERSED AND REMANDED.
All Judges concur.
[1] Thomas was unable to identity either Weaver or Lawson as the individual she had seen running with the gun or as the driver of the car.
[2] Neither Lawson nor Weaver took the stand at trial.
[3] Effective May 1, 1994, Rule 11, Ala.R.Juv.P., was amended to clarify the child's rights at different phases of the case. Subsection (A) enumerates the child's rights when the child is taken into custody, while subsection (B) lists the things as to which a child in custody must be informed before being questioned. Before this amendment, Rule 11(A) listed the same rights of the child now set forth in the current Rule 11(B). When the appellant was questioned in this case, the pre-amendment Rule 11(A) was still in effect. However, because the current Rule 11(B) is in all important respects the same as the former Rule 11(A), we will refer to Rule 11(B) in this opinion when discussing the rights that must be read to a child in custody before questioning. *Page 489