[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 786 
The appellants, Grady Gibson and Eddie Hart, were jointly indicted for the murder of Dana Hart to recover the proceeds of an insurance policy on her life, a capital offense as defined by § 13A-5-40(a)(7), Code of Alabama 1975. Appellant Gibson was convicted of capital murder and was sentenced to life imprisonment without the possibility of parole. Appellant Hart was convicted of manslaughter, a lesser included offense, and was sentenced under the Habitual Felony Offender Act to 50 years' imprisonment.
The evidence tended to show that the appellant, Grady Gibson, met the appellant Eddie Hart in February 1984. Mr. Gibson, who was employed by the Alabama Bureau of Investigation (ABI), had been investigating *Page 787 
Mr. Hart for suspected drug activity. Instead of ultimately making a case against Mr. Hart, Mr. Gibson persuaded Mr. Hart to act as an informant for the ABI. As a result of this association, the appellants became not only co-workers, but also good friends.
Shortly after they began working together the appellants met Dana Pouncey, the deceased, through the course of their drug investigations. Miss Pouncey was a troubled teenager who had both psychiatric problems and drug and alcohol dependencies. She and Mr. Hart immediately became romantically involved and were married in November of 1984.
Around the beginning of December of that same year, Mr. Gibson began displaying behavior around his workplace which appeared, in hindsight, quite peculiar. He became preoccupied with the concept of insurance and the manner in which proceeds were paid. He also was seen reading books on how to commit the "perfect" murder. Later in that same month, he was even overheard in a bar saying to Mr. Hart that if they were going to "knock off" the new Mrs. Hart they had better hurry up and buy some insurance on her.
On January 4, 1985, Mr. Gibson and Mr. Hart visited the office of Oscar Paul Thompson in Alexander City, Alabama, a Liberty National Life Insurance Company agent, to purchase a life insurance policy on Mrs. Hart's life. After reviewing the financial history and present status of the newlyweds, Mr. Thompson proposed a $10,000 policy. Mr. Gibson said that a $100,000 policy would provide more adequate coverage.
On January 14, 1985, after the insurance paperwork was processed, Mr. Hart took Mrs. Hart to Alexander City to discuss the insurance policy with Mr. Thompson. Mrs. Hart, oblivious to the conspiracy against her, agreed to having such a policy taken out on her life. Mr. and Mrs. Hart paid the premium on the policy and left.
One week later, Mr. Hart saw Mr. Thompson at a funeral. Mr. Thompson told Mr. Hart that Liberty National had refused to issue the policy until Mrs. Hart filled out a questionnaire concerning a gunshot wound to the chest that she had received before meeting Mr. Hart, Mr. Thompson gave the questionnaire to Mr. Hart, who in turn communicated this difficulty to Mr. Gibson on the following day.
On January 28, 1985, Mr. Gibson sent his insurance agent, William Cauthen, to Mr. Hart's trailer to discuss a policy on Mrs. Hart's life from New York Life Insurance Company. Mr. Cauthen, unaware of Mr. Hart's previous attempt to buy insurance through Liberty National, also recommended a $10,000 policy. Mr. Hart said that he preferred a $150,000 policy with double indemnity in the case of accidental death. Mr. Cauthen did not argue and allowed Mr. and Mrs. Hart to fill out the application.
On February 25, 1985, the insurance policy was issued by New York Life and was delivered to Mr. and Mrs. Hart. It should be noted that Mr. Gibson gave the Harts the initial $100 premium payment on the policy. The following day, Appellant Gibson invited other co-workers to attend a fishing trip which had been planned for the upcoming weekend.
On Thursday, February 28, 1985, at approximately 7:30 p.m., Mr. Gibson picked Mr. Hart up at Mr. Hart's trailer. Fifteen minutes later, they left for Fish River in Baldwin County. The Hart's next-door neighbor saw Mrs. Hart subsequently leave in her car at approximately 8:00 p.m. This was the last time she was seen alive.
The appellants arrived around midnight at the home of Ira Colvin in Daphne, Alabama. Mr. Colvin was a longtime friend of Mr. Gibson and owned the cabin on Fish River that Mr. Gibson and Mr. Hart were going to use for the weekend. Appellant Gibson told Mrs. Colvin that they had been to the cabin earlier that evening, but that the key that Mr. Colvin had given them did not fit. Mrs. Colvin thought it most peculiar that the key did not fit, in light of the fact that Mr. Colvin had given Appellant Gibson his personal set of keys.
A woman by the name of Rose Pogue, with whom Mr. Gibson had been having an *Page 788 
affair, was working in a motel lounge at the Parkway Truck Stop during this time frame. The appellants spent the better part of the "fishing" weekend in question drinking at this lounge. On the morning of Friday, March 1, Mr. Gibson and Mr. Hart went to the lounge and had a cup of coffee. They appeared to Ms. Pogue to be dirty and tired. Mr. Gibson told Ms. Pogue that he had not slept all night. The next day, Gibson asked her if he could borrow $200 to have a carpet cleaned at the cabin he was staying in. She lent him the money.
Later that day, Ms. Pogue and Mr. Gibson went to a local shopping mall together. During this trip, Mr. Gibson explained to Ms. Pogue that he would be "coming into a lot of money soon" and that he was interested in going into business in Florida. He asked Ms. Pogue if she thought her brother-in-law would be interested in the business venture. Ms. Pogue replied that she did not know.
On Sunday, March 3, 1985, at approximately 4:00 p.m., the appellants returned from their fishing trip. Eight days later, on March 11, 1985, the appellants filed a missing person report with the ABI. Sheriff Sidney Thrash also handled a missing person report which Appellant Hart had filed with him several days earlier. He told Mr. Hart that if Mrs. Hart "came up in a bad way," Mr. Hart would be the first person he wanted to see. At this, Mr. Hart became nervous and left.
Later in the evening of March 11, Mrs. Hart's car was found by her aunt and Mr. Hart in the K-Mart parking lot in Montgomery, Alabama where it had been, according to the K-Mart security guard, for over a week. Police dusted the car for fingerprints and searched it for hair samples, etc., but found nothing of any value to their investigation.
On March 14, 1985, Mr. Gibson received an anonymous letter and phone call at work. The message in both instances was as follows: "You are stupid. Go to the Grace exit in Butler County and look about a mile off 1-65 about ten feet off the road and you will see what is going to happen to your wife and then to you and Eddie Hart. I promise I will kill you." A search team was immediately organized upon receipt of this information.
After leaving I-65 at the Grace exit, Mr. Gibson told the search team to begin searching to the right of the exit, even though these instructions were not given by the anonymous threat. Shortly thereafter, the badly decomposed, unrecognizable remains of a human body were found. Mr. Gibson walked up to the skeleton and said "That's her. That's Dana [Hart]."
Forensic personnel viewed the body, which was not only in an extreme stage of natural decomposition, but was also almost completely destroyed by "animal and insect activity." The only way forensic personnel were able to identify the body was through the use of dental records. An autopsy was performed on the body, which revealed that the cause of death was by stabbing with a knife-like object in the neck area at the base of the skull. Defense wounds, characteristic of a fight or struggle to save one's life, were observed on the hands of the victim.
Approximately two or three months after Mrs. Hart's body was found, Richard Mobley, a friend and co-worker of Mr. Gibson, was at Mr. Gibson's home sharing dinner with Mr. Gibson and his wife, Kathy. Mr. Gibson and Mr. Mobley began discussing rumors that were circulating around town that the appellants had killed Mrs. Hart for the insurance proceeds. Mr. Gibson blurted out "That ain't the motive. The motive is that she found out something about me and was going to flip me. That's the reason I had to kill her."
In October 1985, Mr. Hart filed a lawsuit against New York Life for $150,000. The suit was settled in March of the following year for $80,000 — far less than the policy amount. Ira Colvin received approximately $12,000 of the proceeds; Claude Patton, Mr. Hart's lawyer, received approximately $14,000; Mr. Gibson received $5,000; a woman named Bobbie Nell Williams received $6,000; and Mr. Hart kept the rest. It should also be noted that Mrs. Hart's funeral bill remains unpaid to date. *Page 789 
In May 1986, Richard Mobley and Mr. Gibson were named as defendants in an unrelated civil suit. After a deposition was taken in that suit, Mr. Mobley gave Mr. Gibson a ride home. He explained to Mr. Gibson that since Mr. Gibson was a suspect in the murder of Mrs. Hart, he thought it would be best if they stopped socializing with each other, and, further, that Mr. Gibson should leave town. Mr. Gibson replied, "All right. All right. I will move to California. I killed that girl. I will move to California." He subsequently did move to California.
Towards the end of 1986, Mr. Gibson moved back to Montgomery, Alabama, to start a private investigating firm. He and Mr. Hart were indicted for the capital murder of Mrs. Dana Hart on May 13, 1987, and, thus, this action arose.
The most incriminating evidence against Mr. Gibson are the statements that he made to Mr. Mobley in which he admitted, on two separate occasions, committing the murder. Mr. Gibson defends on the ground that these statements were not confessions but were made in jest and out of frustration.
The most incriminating evidence against Mr. Hart are the statements he made to Ms. Mullins, Dana Hart's aunt. He said, "It was a mistake. This shouldn't have happened" and, "I want to tell you about it but it's just too hard." Mr. Hart defends on the ground that this statement expressed normal feelings when one's wife has just been murdered.
 I
Appellants Gibson and Hart contend that the prosecution's failure to disclose to them prior to trial certain evidence in the State's possession, pursuant to the trial court's discovery order, prejudiced their defense, thereby denying them a fair and impartial trial. Further, Hart and Gibson argue that the prosecution suppressed exculpatory evidence, and violated Rule 18, A.R.Crim.P.Temp., when it refused to furnish grand jury testimony and statements of certain prosecution witnesses that were inconsistent with those witnesses' testimony at trial. Gibson first contends that the trial court erred in allowing a State's witness to testify concerning an oral statement made by Gibson but not disclosed prior to trial, as is required by Rule 18. Appellants contend that, because of these actions by the prosecution, the trial court erred in denying their motions for new trial.
Discovery in a criminal case is governed primarily by Rule 18 of our Temporary Rules of Criminal Procedure. Rule 18.1, A.R.Crim.P.Temp., provides as follows:
"18.1. Discovery by the Defendant.
 "(a) STATEMENTS OF DEFENDANT. Upon motion of the defendant the court shall order the district attorney:
 "(1) To permit the defendant to inspect and copy any written or recorded statements made by the defendant to any law enforcement officer, official, or employee which are within the possession, custody, or control of the state, the existence of which is known to the district attorney; and
 "(2) To disclose the substance of any oral statements made by the defendant before or after arrest to any law enforcement officer, official, or employee which the state intends to offer in evidence at the trial.
 "(b) STATEMENTS OF CO-DEFENDANT OR ACCOMPLICE. Upon motion of the defendant the court shall order the district attorney:
 "(1) To permit the defendant to inspect and copy any written or recorded statements which the state intends to offer in evidence at the trial made by a co-defendant or accomplice to any law enforcement officer, official, or employee, which are within the possession, custody, or control of the state, the existence of which is known to the district attorney; and
 "(2) To disclose the substance of any oral statements made by any such co-defendant or accomplice before or after arrest to any law enforcement officer, official, or employee which the state intends to offer in evidence at the trial. *Page 790 
 "(c) DOCUMENTS AND TANGIBLE OBJECTS. Upon motion of the defendant the court shall order the district attorney to permit the defendant to analyze, inspect, and copy or photograph books, papers, documents, photographs, tangible objects, controlled substances, buildings or places or portions of any of these things, which are within the possession, custody, or control of the state and:
 "(1) Which are material to the preparation of his defense; provided, however, the defendant shall not be permitted to discover or inspect reports, memoranda, witness lists, or other internal state documents made by the district attorney or his agents, or by law enforcement agents, in connection with the investigation or prosecution of the case, or statements made by state witnesses or prospective state witnesses;
 "(2) Which are intended for use by the state as evidence at the trial; or
 "(3) Which were obtained from or belongs to the defendant.
 "The court shall impose such conditions or qualifications as may be necessary to protect the chain of custody of evidence, or the attorney's, law enforcement officer's, or investigator's work product, or to prevent loss or destruction of such documents or objects.
 "(d) REPORTS OF EXAMINATIONS AND TESTS. Upon motion of the defendant the court shall order the district attorney to permit the defendant to inspect and copy any results or reports of physical or mental examinations or scientific tests or experiments, if the examinations, tests, or experiments were made in connection with the particular case and the results or reports are within the possession, custody, or control of the state, and their existence is known to the district attorney.
 "(e) INFORMATION NOT DISCOVERABLE. Except as provided in (a), (b), and (d), the discovery or inspection of reports, memoranda, witness lists, or other internal state documents made by the district attorney or his agents, or by law enforcement agents, in connection with the investigation or prosecution of the case, or of statements made by state witnesses or prospective state witnesses, is not authorized.
 "(f) DISCOVERY UNDER OTHER PROVISIONS OF LAW. Nothing in this Temporary Rule 18.1 shall be construed to limit the discovery of exculpatory material or other material to which a defendant is entitled under constitutional provisions or other provisions of law."
Oral statements made by the accused to any law enforcement officer, official, or employee must be disclosed to the accused prior to trial if the State intends to offer them into evidence at trial. See also Ex parte Lambert, 519 So.2d 899 (Ala. 1987). Thus, the prosecution was obliged to disclose to the defendants the oral statement Gibson made to law enforcement officials — "That's her. That's Dana." — upon discovery of Dana Hart's remains. When the State attempted to get this statement into evidence, Gibson's attorney objected, arguing that the State had failed to disclose this statement to the defense pursuant to the court's discovery order, and, therefore, that it could not be received into evidence against his client. The trial court agreed, informing the State, "If you haven't provided them with this statement then I will sustain the objection." The State's attorneys denied defense counsel's allegation, stating that all statements made by Gibson had been disclosed as ordered. Thereupon, the judge and attorneys for both sides retired to chambers to resolve the dispute. An acrimonious exchange between counsel ensued. At the conclusion of this "swearing match," the trial court, apparently satisfied that the State had indeed disclosed the contents of Gibson's oral statement to Gibson's attorneys, overruled their objection and indicated that the statement would be received into evidence.
We see no reason to overturn the trial court's decision to allow that statement into evidence. The trial judge was in a better position to determine what was contained in the statements disclosed to the *Page 791 
defense attorneys — something which this court is unable to do, since Gibson's statement was not included in the record before us. We are able to determine, however, that four statements made by Gibson were provided to defense attorneys, as is evidenced by the receipt bearing the signature for one of the secretaries for one of the defense lawyers. Appellant has the responsibility to provide a complete record on appeal.Montgomery v. State, 504 So.2d 370, 372 (Ala.Cr.App. 1987). A reviewing court cannot predicate error on matters not shown by the record. Robinson v. State, 444 So.2d 884, 885 (Ala. 1983). In the absence of any evidence to the contrary, the trial court's ruling must be taken as correct. Thus, the trial court committed no error in allowing the State's witness's testimony as to Gibson's oral statement to be received into evidence.
We must now turn to the discoverability of statements of certain prosecution witnesses. The statements sought by Gibson were the memoranda prepared by the investigating officers. The general rule is that the accused is not entitled to discover statements of government witnesses before trial. Britain v.State, 518 So.2d 198, 203 (Ala.Cr.App. 1987), cert. denied,486 U.S. 1008, 108 S.Ct. 1736, 100 L.Ed.2d 199 (1988). However, as stated in Ex parte Pate, 415 So.2d 1140, 1144 (Ala. 1981):
 "The rule of discovery is different where a prosecution witness has testified on direct examination in the trial of the case.
 "In such cases, the defendant, upon laying a proper predicate, is entitled to have the Court, at least conduct an in camera inspection as outlined in Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959). The trial court could determine initially (1) whether the statement made by the witness before trial differed in any respects from statements made to the jury during trial, and (2) whether the statement requested was of such a nature that without it the defendant's trial would be fundamentally unfair. Cooks [v. State, 50 Ala. App. 49, 276 So.2d 634, cert. denied, 290 Ala. 363, 276 So.2d 640 (1973)], supra.
 "The production for inspection of any statement, of course, would lie within the sound discretion of the trial judge."
Pate applies only to statements in writing prepared by the witness, or on his behalf, and signed or otherwise authenticated by him. Williams v. State, 451 So.2d 411, 416
(Ala.Cr.App. 1984). "'A statement, memoranda, or notes, not read by the witness interviewed and not signed or authenticated by the witness cannot be considered evidence.'" Id. quotingCooks v. State, 50 Ala. App. 49, 276 So.2d 634, 637, cert.denied, 290 Ala. 363, 276 So.2d 640 (1973).
Here, the "statements" sought were not actually statements, but, rather, memoranda prepared by the investigating officers. Thus, Pate has no bearing on this issue in the instant case. Furthermore, such memoranda are specifically excluded from discovery by Rule 18.1(c)(1) and (e), A.R.Crim.P.Temp. Therefore, the trial court's decision was correct.
The remaining discovery issue concerns the discoverability of the grand jury testimony of certain prosecution witnesses. First, the appellant must show a justifiable need to have the grand jury minutes revealed to him. McConico v. State,458 So.2d 743, 748 (Ala.Cr.App. 1984). This court addressed the availability of grand jury testimony for the impeachment of prosecution witnesses and the procedures to be followed inMillican v. State, 423 So.2d 268 (Ala.Cr.App. 1982). InMillican, Judge Bowen, writing for the court, stated as follows:
 "It is a clear and fundamental rule that before a witness may be impeached by extrinsic evidence, 'the impeaching party must lay a proper predicate by asking the party being impeached whether he made such statement, specifying with reasonable certainty the time when, the place where, the person to whom such supposed statement was made and the substance of such statement.' C. Gamble, McElroy's Alabama Evidence, Section 157.01 et seq. (3rd ed. 1977). *Page 792 Bryson, [v. State], 38 Ala. App. [517] at 520, 84 So.2d 782 [1955].
 "Before a defendant is allowed to inspect a transcript of a State's witness who testified before the grand jury or before a trial judge should conduct an in camera inspection of such testimony, see Palermo [v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959)] and Pate, supra, the defendant should at least and at a very minimum make some offer of proof (1) that the matters contained in the witness' grand jury testimony were relevant to the subject matter of the prosecution; (2) and that there exists an inconsistency between grand jury testimony and trial testimony. Unless defense counsel is merely going on a fishing expedition, he will have some information as to the particular inconsistency in the defendant's testimony. In this case no such showing was made and the existence of any inconsistency between the witness' trial and grand jury testimony was never even alleged. Cooks, supra. Also, there was no showing that the witness' grand jury testimony, if available, was 'of such nature that without it the defendant's trial would be fundamentally unfair.' Cooks, 50 Ala. App. at 54, 276 So.2d 634. See also Husch v. State, 211 Ala. 274, 276, 100 So. 321 (1924) ('Moreover, if the solicitor had had such a statement in his possession, defendant could have required its production by a rule of the court if he thought it was favorable to him.')
 "In laying the proper predicate for examination of a witness' grand jury testimony, it should also be established that the witness testified before the grand jury and that such testimony was recorded or reduced to writing, unless a grand juror will be called to disclose the testimony of the witness. Alabama Code 1975, Section 12-16-201.
 "'When the defendant, in effect, asks for the State District Attorney to produce a document, he should at least establish that this State official has such document or a copy thereof in his possession before the trial court will be put in error.' Strange v. State, 43 Ala. App. 599, 606, 197 So.2d 437, cert. dismissed, 280 Ala. 718, 197 So.2d 447 (1967).
 "Once the defendant has laid a proper predicate for the impeachment of a witness who testified before the grand jury, the trial judge should conduct an in camera inspection as outlined in Palermo, supra, and Pate, supra, to determine (1) whether the statement made by the witness before the grand jury 'differed in any respects from statements made to the jury during trial,' Pate, supra, and (2) whether the grand jury testimony requested by the defendant 'was of such a nature that without it the defendant's trial would be fundamentally unfair.' Pate, supra. This procedure will best preserve and protect the legislative determination that 'it is essential to the fair and impartial administration of justice that all grand jury proceedings be secret and that the secrecy of such proceedings remain inviolate.' Alabama Code 1975, Sections 12-16-214 through 226."
423 So.2d at 270-71.
Our examination of the record below reveals that the trial court followed the guidelines established in Millican. After anin camera inspection of all grand jury testimony and available trial testimony, the court concluded that, contrary to appellants' assertions, no relevant material inconsistencies existed between the testimony of witnesses before the grand jury and the testimony given at trial. Neither does this court find that without the witnesses' grand jury testimony appellants' trial would have been fundamentally unfair. Under these circumstances, the trial court correctly denied appellants' request to view the grand jury testimony.
We would further note that none of the memoranda or grand jury testimony contained any exculpatory evidence or evidence which would have affected the outcome of this trial. Thus, noBrady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215
(1963), analysis is required.
 II
Appellant Gibson contends that the trial court erred by commenting, in the *Page 793 
presence of the jury, on the evidence being presented. The complained-of remarks occurred during the cross-examination of State's witness Charles Costner. In an effort to impeach Costner, defense counsel requested that Costner's previous grand jury testimony be provided to him. The trial judge responded:
 "THE COURT: You can't have them until you, until the Court has reviewed them to see whether there's any inconsistent statements.
"MR. CLARK: Yes, sir.
 "THE COURT: I have reviewed them. There is no inconsistent statements at this point.
 "These statements clearly show that he did talk to them and that he did mention insurance to them."
No objection was made by defense counsel, and cross-examination of Costner continued. Moments later, defense counsel again requested that the grand jury testimony be produced, to which the trial judge stated:
 "MR. CLARK: Judge, we would ask that, that Your Honor give us the statements and the Grand Juries', both Grand Juries' testimony with regard to inconsistencies.
 "THE COURT: I have checked them here. I don't find any inconsistency."
Again, no objection was made, and cross-examination continued. The trial judge subsequently determined that it was necessary that he confer with the attorneys in chambers. The availability of Costner's grand jury testimony was once again the topic of conversation. The trial judge repeated his earlier ruling that, as there were no inconsistencies between Costner's grand jury testimony and his current trial testimony, defense counsel was not entitled to use the grand jury testimony for impeachment purposes. Thereupon, defense counsel moved for a mistrial, stating that the trial court's rulings on his request, which were made in the presence of the jury, constituted an impermissible comment on the evidence. The motion was denied, concluding the conference; the parties returned to the courtroom and cross-examination of Costner continued.
Contrary to Gibson's contention, the trial judge's remarks were not a comment on the evidence. Rather, these remarks were an explanation of his rulings. As we noted in Sanders v. State,426 So.2d 497, 507 (Ala.Cr.App. 1982):
 "The trial court merely explained its reasons and its ruling during the cross-examination of [the witness]. Such does not constitute a comment on the evidence. McDonald v. State, 340 So.2d 80
(Ala.Cr.App.), cert. denied, 340 So.2d 84 ([Ala.] 1976)."
Thus, appellant was not entitled to a mistrial. Therefore, no error occurred.
 III
Appellant Gibson next contends that the State's attorneys were guilty of prosecutorial misconduct when, on two separate occasions, they engaged in a line of questioning which, he argues, implied the existence of a factual predicate which the attorneys knew to be unsupported by the evidence.
The first incident of alleged prosecutorial misconduct occurred during the State's cross-examination of appellant Gibson, wherein the following occurred:
 "Q Now, you know about lawsuits, don't you, Mr. Gibson?
"A I'm vaguely familiar with lawsuits, yes, sir.
 "Q And the lawsuit where you and Randy Mobley got sued, Randy Mobley didn't have to pay no money to anybody, did he?
"A I, I don't know.
"Q But you did, didn't you?
 "A I don't know if I had to or not. I ended up doing it.
 "Q You paid over $20,000.00 for framing a man on a drug sale, didn't you?
 "MR. CLARK: Judge, now, I'm going to object to that. If he wants to introduce the pro tanto settlement with the State of Alabama, if he will introduce the pro tanto settlement that got Mobley out of that then I will withdraw my objection. I want the statement, if he's going to do it, I want the pro tanto statement of how much the State *Page 794 
of Alabama paid. I want to put it in, Judge, if he's going into it.
"MR. VALESKA: Can I finish?
 "I don't care. He can introduce whatever he wants to.
 "MR. CLARK: They've got it. I mean it's a public record if he's going into it I want what they paid.
 "MR. VALESKA: I just told him he can introduce whatever he wants.
 "MR. CLARK: No, Judge, I want him to give it to me. They've got it. They know what it was.
 "THE COURT: Furnish it to him, Mr. Valeska, if you have it.
"MR. VALESKA: Pardon?
"THE COURT: Furnish it to him if you've got it.
 "MR. VALESKA: I don't have it, Judge, but I will get it for him.
"THE COURT: All right.
 "MR. VALESKA: It's cross-examination. I will get it for him."
As can be seen from the above-excerpted portion of the transcript, both attorneys knew that there was a factual basis for this line of questions. Moreover, defense counsel obtained a favorable ruling to his objection when the trial court ordered the prosecutor to produce a copy of the settlement order in the civil suit. The prosecutor then informed the court that, although he did not have a copy of the settlement order with him, he would supply defense counsel with a copy of it at some unspecified point in the future. The record, however, reveals that defense counsel failed to hold the State to its promise to produce the copy of the settlement order, as was his burden. See Donahoo v. State, 505 So.2d 1067, 1072 (Ala.Cr.App. 1986). In the absence of an adverse ruling on a motion to exclude, nothing is preserved for appellate review. Reeves v.State, 456 So.2d 1156, 1160 (Ala.Cr.App. 1984). We would further note that evidence concerning this lawsuit (and Gibson's apparent need for money) was admissible to show appellant Gibson's motive to commit the offense of murder for pecuniary gain. See C. Gamble, McElroy's Alabama Evidence § 45.01(8) (3d ed. 1977).
The second alleged incident of prosecutorial misconduct occurred during the cross-examination of defense witness Sandra Colvin. Our examination of the record, however, reveals that at no time during the State's cross-examination did defense counsel object to this line of questioning by the State. Indeed, the only objection made during Ms. Colvin's cross-examination concerned a question which asked her to testify about what her husband had knowledge of, which objection was correctly sustained. Absent any objection to this testimony at trial, nothing has been preserved for appellate review, as "objections to evidence cannot be raised for the first time on appeal." Hilley v. State, 484 So.2d 476, 483
(Ala.Cr.App.), aff'd, 484 So.2d 485 (Ala. 1985).
 IV
Appellant Hart contends that the trial court erred in refusing to sever the trials of Hart and his co-defendant (and co-appellant) Grady Gibson. Hart and Gibson were jointly indicted for the capital murder of Dana Hart. As previously mentioned, Hart was found guilty of manslaughter, while Gibson was convicted of capital murder.
Rule 15.4, A.R.Crim.P.Temp, governs the joinder, consolidation, and severance of defendants. Grounds for the severance of defendants are found in Rule 15.4(d), which provides as follows:
 "(d) SEVERANCE GROUNDS. If the court finds that by a joinder of defendants in an indictment, information, or complaint, or a joinder by order of court, as provided in this rule, a defendant or the state may be prejudiced to the extent that a fair trial cannot be afforded, the court shall order a severance of defendants or provide whatever other relief justice requires. However, without a finding of prejudice, the court may, with the agreement of all the parties, order a severance of defendants."
The case of Holsemback v. State, 443 So.2d 1371 (Ala.Cr.App. 1983), first recognized the constitutionality of joint trials under Rule 15.4, A.R.Crim.P.Temp. In *Page 795 Holsemback, Judge Bowen, writing for the court, stated as follows:
 "The trial of multiple defendants carries 'substantial risks of manifest unfairness.' United States v. McLaurin, 557 F.2d 1064, 1074 (5th Cir. 1977). 'Inherent in every joint trial is, of necessity, some degree of bias. Only in the event such prejudice appears to be compelling does severance become warranted.' United States v. Marszalkowski, 669 F.2d 655, 660 (11th Cir. 1982).
 " 'Although the risk of prejudice, either from the jury's perception of evidentiary spillover or transference of guilt, exists in any joinder of offenses or defendants, the trial court weighs that risk against the interest of judicial economy. In reviewing improper denial of severance claims, courts of appeals require that the defendant demonstrate that the trial court abused its discretion by showing that the failure to sever resulted in compelling prejudice. . . .
 " 'The defendant bears a difficult burden in attempting to show that joinder of defendants or charges created substantial or compelling prejudice. The defendant fails to meet this burden if he merely asserts that acquittal is more likely if he is tried in a separate action or that much of the prosecution's evidence relates to only one of the codefendants. Compelling prejudice requiring severance does not result when the evidence against the codefendant is more damaging than against the defendant, or when the prosecution introduces into evidence a codefendant's past criminal record or reputation. . . .
 "'Severance may be required when codefendants' inconsistent defenses are prejudicial because they are mutually exclusive and irreconcilable or might mislead or confuse the jury. The defendant may demonstrate the level of antagonism requiring severance by showing that the jury had to disbelieve testimony offered in behalf of a codefendant in order to believe the core of evidence offered by the defendant. In determining whether prejudice resulting from jury confusion requires severance, courts focus on whether the jury reasonably could be expected to "compartmentalize" the evidence and charges against each defendant. Courts also consider the effectiveness of the jury instructions, the complexity of the case, and the total weight of evidence against each defendant.'
 Twelfth Annual Review Of Criminal Procedure: United States Supreme Court and Courts of Appeals
1981-1982, 71 Geo.L.J. 339, 494-98 (1983).
 "The test of whether a severance should be granted on the ground of prejudice to the defendants is whether under all the circumstances as a practical matter it is within the capacity of the jurors to follow the court's instructions and to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts. McLaurin, 557 F.2d at 1075. The trial judge must weigh the prejudice attendant to a joint trial against the interests of judicial economy. 'Of necessity, this balancing process is committed in the first instance to the sound discretion of the trial judge, and an appellate court will not substitute its own judgment for that of the lower court absent an affirmative showing that the lower court has abused its discretion.' McLaurin, 557 F.2d at 1075."
443 So.2d at 1377-78; see also Collins v. State, 508 So.2d 295,300-01 (Ala.Cr.App. 1987).
On appeal, "appellant has a heavy burden of establishing that he was unable to obtain a fair trial without a severance and that he suffered compelling prejudice which the trial court could not prevent." Murray v. State, 494 So.2d 891, 894
(Ala.Cr.App. 1986). In light of the test and considerations set out in Holsemback, this court finds no compelling prejudice to the codefendants here. Moreover, the cases relied on by Appellant Hart are factually distinguishable from those in the case at bar. In both Hill v. State, 481 So.2d 419 (Ala.Cr.App. 1985), and Herron v. State, 481 So.2d 425 (Ala.Cr.App. 1985), cited by *Page 796 
Appellant Hart, the defenses relied on by the codefendants were hostile and mutually exclusive. The defenses relied on by Hart and Gibson, however, were corroborative, supportive, mutually inclusive, and virtually identical. Thus, the trial court correctly refused to sever the trials of Hart and Gibson.
Hart argues, however, that his trial should have been severed from Gibson's for yet another reason. Specifically, he contends that the trial court erred by receiving into evidence statements made by Gibson. This, he argues, violates the rule established by Bruton v. United States, 391 U.S. 123,88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The facts in Bruton, however, are distinguishable from those in the instant case, in that the statements made by Bruton's codefendant implicated Bruton as well as himself. Here, Gibson's statements did not implicate Hart; indeed, the statements received into evidence did not even mention Hart. We find, therefore, the case of Richardsonv. Marsh, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), to be controlling. Justice Scalia, writing for the Court, stated as follows:
 "The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process. On the precise facts of Bruton, involving a facially incriminating confession, we found that accommodation inadequate. As our discussion above shows, the calculus changes when confessions that do not name the defendant are at issue. While we continue to apply Bruton where we have found that its rationale validly applies, see Cruz v. New York, [481] U.S. [186], 107 S.Ct. 1714, 94 L.Ed.2d [162], we decline to extend it further. We hold that the Confrontation Clause is not violated by the admission of a . . . codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to [his] existence."
107 S.Ct. at 1709 (footnote omitted).
In the instant case, Gibson's statements did not even have to be edited, because they made no reference to Hart. Moreover, the fact that the jury found Hart guilty of manslaughter and Gibson guilty of capital murder convinces us that the jury not only could, but did, consider the evidence against them separately and judge each on his own culpability.
 V
Appellant Hart further contends that the trial court erred in failing to grant his motion for a mistrial or his subsequent motion for a new trial based on a juror's failure to respond on voir dire. We note that the juror in question, Mrs. Lena Griffin, was excused prior to opening arguments and did not participate in any of the jury's deliberations. Therefore, the appropriate inquiry does not concern Mrs. Griffin's failure to respond during voir dire, but, rather, whether the remarks made by Mrs. Griffin during voir dire were heard by anyone who ultimately served on the appellant's jury, thereby contaminating the jury.
"A motion for mistrial implies a miscarriage of justice and is such a serious matter that it should be granted only where there is a fundamental error in the trial which would vitiate the result. Montgomery v. State, 446 So.2d 697, 702
(Ala.Cr.App. 1983), cert. denied, 469 U.S. 916, 105 S.Ct. 291,83 L.Ed.2d 227 (1984)." Thompson v. State, 527 So.2d 777, 779
(Ala.Cr.App. 1988). "Where error is eradicable a mistrial is too drastic and is properly denied." Woods v. State,460 So.2d 291, 296 (Ala.Cr.App. 1984); Chillous v. State, 405 So.2d 58,61 (Ala.Cr.App. 1981).
Our examination of the record reveals that near the end of the trial, the trial judge was informed that, while the jury panel was being qualified, Mrs. Griffin had expressed an opinion as to appellants' guilt. This juror was subsequently excused from the jury and took no part in any of the jury's deliberations. Upon learning of this juror's comment, defense counsel immediately *Page 797 
moved for a mistrial. The motion was denied. Thereafter, the attorney for Gibson stated, "Judge, I wonder [if] somebody on this panel heard her express her opinions." However, neither defense counsel made a formal motion that the jury be polled concerning this matter, nor did they request curative instructions of any kind. The attorneys were assured that they could pursue this matter by motion for a new trial if necessary.
We would first note that appellants' attorneys failed to pursue the course of action necessary to investigate the potential contamination of their clients' jury. Moreover, if, in fact, Mrs. Griffin's remarks were overheard by any member of the jury, ineradicable error would not have occurred. Indeed, we find the facts in the instant case to be analogous to those in Hopkins v. State, 429 So.2d 1146, 1152 (Ala.Cr.App. 1983), wherein this court held that the trial court's inquiry as to whether other jurors, who overheard one venireman's remark that the accused should already have been hanged, could disregard the comment, and the trial court's curative instructions on the subject were sufficient to remove the harmful effect of the remark. Therefore, the trial court's denial of the motion for mistrial should not be disturbed.
Neither was Appellant Hart entitled to a new trial based on this issue. All that was adduced concerning this issue during the hearing on appellants' motion for new trial was that Mrs. Griffin remarked to Sylvia Hamilton that "she felt that, that the girl who was dead, her life meant as much to her as the insurance money meant to him." Ms. Hamilton went on to state that Mrs. Griffin did not make any specific remarks as to whether she believed the appellants were guilty or innocent. Ms. Hamilton added that she did not think anyone else had heard Mrs. Griffin's remarks. None of the jurors who returned the guilty verdict were subpoenaed to testify whether any of them had overheard Mrs. Griffin's remarks.
We find Ms. Hamilton's testimony insufficient to establish any contamination of the appellants' jury. The decision of the trial court to deny a motion for new trial will not be disturbed on appeal unless there is a clear showing that the trial court abused its discretion. Nichols v. State,500 So.2d 92, 96 (Ala.Cr.App. 1986). No such abuse occurred in the instant case.
 VI
Appellant Hart also maintains that his manslaughter conviction is due to be reversed because manslaughter is not a lesser included offense of murder for pecuniary gain, the capital offense for which he was indicted. We note, however, that Appellant Hart requested that the trial court instruct the jury on manslaughter as a lesser included offense of capital murder.
 "Hence, even if the given charge was improper, we would not regard [appellant's] complaint as meritorious for he has no cause to complain. A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions. 24A C.J.S. Criminal Law § 1842 (1962). See also Brannon v. State, 12 Ala. App. 189, 67 So. 634, 635
(1914), cert. denied, 191 Ala. 29, 67 So. 1007
(1915); Livingston v. State, 7 Ala. App. 43, 61 So. 54, 57 (1912) (on rehearing). As Presiding Judge Bowen noted in applying the invited error doctrine, 'It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice.' Murrell v. State, 377 So.2d 1102, 1105
(Ala.Crim.App.), cert. denied, 377 So.2d 1108 (Ala. 1979), quoting Aldridge v. State, 278 Ala. 470, 179 So.2d 51, 54 (1965). The doctrine of invited error has been specifically applied to possible error resulting from the defendant's request for a particular jury instruction. E.g. Jelks v. State, 411 So.2d 844, 848 (Ala.Crim.App. 1981); Burke v. State, 18 Ala. App. 152, 89 So. 162, 164 (1921); People v. Clements, 316 Ill. 282, 147 N.E. 99
(1925); *Page 798 Partee v. State, 19 Ga. App. 752, 92 S.E. 306
(1917)."
Leverett v. State, 462 So.2d 972, 976-77 (Ala.Cr.App. 1984). Because Hart requested the manslaughter instruction, he is estopped from complaining of any possible error which may have resulted therefrom.
 VII
The appellants contend that the evidence adduced at trial was insufficient to support their convictions, because, they argue, the State failed to present any direct evidence which linked them to Dana Hart's murder. More specifically, the appellants explain away those circumstances which are highly incriminating as simply "bizzare coincidences" and contend that such circumstantial evidence does not prove their guilt beyond a reasonable doubt.
It must first be noted that the mere fact that evidence is of a circumstantial nature does not make it deficient; circumstantial evidence should be given the same weight as direct evidence, provided it points to the guilt of the accused. Linzy v. State, 455 So.2d 260, 262 (Ala.Cr.App. 1984). Further, such evidence should be reviewed by this court in the light most favorable to the State, Bass v. State, 55 Ala. App. 88, 313 So.2d 208 (1975), and our judgment should not be substituted for that of the jury, Cumbo v. State,368 So.2d 871, 875 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979).
Under the principles set out above, we find that the State's evidence was sufficient to prove both appellants' guilt beyond a reasonable doubt. Appellants contend that each fact proven at trial was not only lawful, but also normal. However, a combination of these facts excludes every reasonable hypothesis but that of the guilt of the accuseds. Cumbo, 368 So.2d at 874.
Our review of the evidence convinces us that it was not simply a "bizzare coincidence" that Dana Hart disappeared and was killed within days of the issuance of a $150,000 insurance policy on her life, and that later her body turned up on the precise route the appellants took on the night of her disappearance.
The evidence against Gibson is substantial. He was able to identify the skeletal remains of the deceased even though forensic scientists were not able to identify the body until dental records had been obtained. He also received a part of the insurance proceeds. As if this were not sufficient, Mr. Gibson later admitted to the murder on two separate occasions. Indeed, all material circumstances in the evidence point to Appellant Gibson's guilt of murder for pecuniary gain.
Appellant Hart was also charged with the capital offense of murder for pecuniary gain. Hart, however, requested a jury instruction on manslaughter as a lesser included offense of capital murder. The trial court granted Hart's request, and he was ultimately convicted of manslaughter. The evidence against Hart was also substantial, and more than sufficient to convict him of manslaughter.
 VIII
Appellant Hart's final contention is that the trial court erred in sentencing him under the Habitual Felony Offender Act, § 13A-5-9, Code of Alabama 1975, because all but one of the prior felony convictions used for enhancement were drug-related offenses, which fall outside the scope of our Criminal Code. He cites as authority for his position the decision in Ex parteChambers, 522 So.2d 313 (Ala. 1987), wherein our Supreme Court held that a defendant convicted of felony drug possession under § 20-2-70, Code of Alabama 1975, and whose prior conviction was drug-related, was not subject to sentencing under the Habitual Felony Offender Act. Neither can a defendant convicted of felony drug possession whose prior convictions are non-drug related, and fall within the Criminal Code, be sentenced under the Habitual Felony Offender Act. Ex parte Brannon,547 So.2d 68 (Ala. 1989). The Supreme Court has also made it clear that it has not yet addressed the issue of whether prior felony drug convictions can be used under the Habitual Felony Offender Act to enhance punishment for non-drug *Page 799 
related felonies. Chambers, supra, 522 So.2d at 316 n. 2. This issue has, however, arisen in prior cases before this court. Therefore, under the doctrine of stare decisis, we must look to these decisions for an answer.
Section 13A-5-9(a), Code of Alabama 1975, provides as follows:
 "In all cases when it is shown that a criminal defendant has been previously convicted of any felony and after such conviction has committed another felony, he must be punished as follows:" (Emphasis supplied.)
This court has previously stated that "all that is required to set the Habitual Felony Offender Act into motion is a previous felony conviction." Walton v. State, 461 So.2d 894,899 (Ala.Cr.App. 1984). Moreover, we have held that the language "previously convicted of any felony," as found in the Habitual Felony Offender Act, means that all prior felony convictions come within the purview of the statute, regardless of what their origin may be. Long v. State, 446 So.2d 658, 660
(Ala.Cr.App. 1983); Watson v. State, 392 So.2d 1274, 1279
(Ala.Cr.App. 1980), cert. denied, 392 So.2d 1280 (Ala. 1981). In Watson, a prior felony drug conviction was used for sentence enhancement under § 13A-5-9. However, this court found that it could not be used, but only because it was not shown that the appellant, at the time of that conviction, was either represented by counsel or had waived representation of counsel. 392 So.2d at 1279. Moreover, in Seritt v. State, 401 So.2d 248,250 (Ala.Cr.App.), cert. denied, 401 So.2d 251 (Ala. 1981), we held that the appellant, who had been convicted of robbery, had been correctly sentenced under the Habitual Felony Offender Act after the State had proved that the appellant had five prior felony drug convictions.
Following Hart's conviction for manslaughter, a sentencing hearing was conducted. The State introduced proof of Appellant Hart's prior burglary conviction and five prior felony drug convictions. At the time of Dana Hart's death, manslaughter was a Class C felony. Commentary, § 13A-6-3, Code of Alabama 1975. Therefore, § 13A-5-9(c)(1) determined the sentence which Hart would receive. This section provides as follows:
 "(c) In all cases when it is shown that a criminal defendant has been previously convicted of any three felonies and after such convictions has committed another felony, he must be punished as follows:
 "(1) On conviction of a Class C felony, he must be punished by imprisonment for life or for any term not more than 99 years but not less than 15 years; . . ."
Hart's sentence of 50 years' imprisonment is within the statutory guidelines established by our legislature. Therefore, no reason exists to disturb his sentence.
Appellants Hart and Gibson received a fair trial. The judgment of the trial court is therefore due to be, and it is, hereby, affirmed.
AFFIRMED.
All the Judges concur.