The appellant was indicted in a nine-count indictment, which charged that the appellant committed: rape in the first degree against S.A.C., sodomy in the first degree against S.A.C., burglary in the first degree against P.C.H., sexual abuse in the first degree against P.C.H., burglary in the first degree against S.B., assault in the second degree against S.B., burglary in the first degree against J.C., rape in the first degree against J.C., and sexual abuse in the first degree against T.S. The appellant filed a motion for severance of offenses and the trial court granted the motion, ordering the offenses severed as to each victim. The appellant pleaded guilty to the *Page 945 
charge of burglary in the first degree against P.C.H. and was sentenced to 20 years in the state penitentiary. The appellant was convicted of the charge of burglary in the first degree committed against J.C. and the charge of rape in the first degree also committed against J.C. The appellant was sentenced to life imprisonment pursuant to both convictions; these sentences to run consecutively. The sentences were also to run consecutively with the appellant's sentence of 20 years imposed in the prior burglary conviction. The appellant was further ordered to pay $420 in medical expenses, $10,000 to the victims' compensation fund, and court costs.
 I
The appellant argues that his federal and state constitutional rights to an impartial jury were violated, because one of the prospective jurors stated, during the voir dire, that she had heard a lot about the case. The record indicates that the following transpired during voir dire:
 "[PROSECUTOR]: Okay. If the evidence comes out that the defendant at one time was a school teacher or a coach in the city or county system, would that create any problems with you two ladies? Did you ever know him through your association with the school system?
 "[PROSPECTIVE JUROR]: No, but I really — I just feel like I know a whole lot about this. I've heard a lot about it
 "[PROSECUTOR]: Pardon me. I'm a little bit hard of hearing.
 "[PROSPECTIVE JUROR]: I have heard a whole lot about this, about this case, etc.
 "[PROSECUTOR]: Okay. Are you saying you don't want to serve?
"[PROSPECTIVE JUROR]: I think maybe I shouldn't.
"[PROSECUTOR]: And your name is Patterson?
"[PROSPECTIVE JUROR]: Yes.
 "[PROSECUTOR]: Ms. Patterson, do you think, then, that because of what you have heard about the case you wouldn't want to serve?
 "[PROSPECTIVE JUROR]: I wouldn't want to be biased, and I've heard it from too many people about the case.
 "[PROSECUTOR]: So you just think you would be unable to render a fair and impartial verdict based on the evidence?
 "[PROSPECTIVE JUROR]: It's possible I wouldn't be able to.
"[PROSECUTOR]: Thank you, Ms. Patterson."
Subsequently, the defense counsel asked the following questions during voir dire:
 "[DEFENSE COUNSEL]: [PROSECUTOR] asked you a moment ago if anybody had heard anything about this case. Would y'all raise your hands again, the people that have read or heard something about this case?
(Several responded.)
 "[DEFENSE COUNSEL]: The fact that you have heard or read something about this case, will that in any way keep you from rendering a fair and impartial verdict in the case?
(No response.)
 "[DEFENSE COUNSEL]: Do any of you believe everything you read in the newspaper? I know Joe doesn't.
(No response.)
 "[DEFENSE COUNSEL]: Can you put that out of your mind and be fair and impartial in this case?
(No response.)
 "[DEFENSE COUNSEL]: Ms. Patterson, let me talk to you for just a moment. Don't get embarrassed, now. Let's just talk. I know there are a lot of people in the room. Let's just try to act like it's just you and I talking. Okay. You said you have heard about the case. I don't want to know what you heard about the case. Okay. All I want to know is this: Could you serve on this jury, and would your verdict, if you were on this jury, be based — could it be based on what comes from this witness stand? Could you be fair to both sides, both the prosecutor and the defense? Do you think you can do that?
"[PROSPECTIVE JUROR]: I think so.
 "[DEFENSE COUNSEL]: That's absolutely all that anybody wants of you. *Page 946 
Not whether or not you have heard something in the past, but if you can — if your decision in this case will be based on what comes from the witness stand, using the common sense that you have got and make that decision — if you can do that, that's all anybody can ask of you. Can you do that?
"[PROSPECTIVE JUROR]: Yes, sir, I believe so."
Following the voir dire questioning, the prosecutor attempted to have the prospective juror stricken for cause "based on what she said in the first discussion." The trial court then asked the defense counsel, "[W]hat do you all want to do?" The defense counsel responded with a motion to strike the entire panel based upon the prospective juror's statements that she knew too much about the case and did not want to be biased. The trial court overruled the defense counsel's motion and the appellant then objected to her being struck. The trial court responded, "All right. She stays on." Subsequently, the prosecutor used one of his peremptory strikes against this prospective juror and, during a hearing held on the appellant's motion made pursuant to Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the state acknowledged that he struck the prospective juror because she initially indicated she had some prior knowledge of the case and felt she might not be able to render a fair and impartial verdict.
Thus, the prospective juror merely stated that she felt that she knew a lot about the case and might be biased. She did not reveal any of the details of the case.
In Gibson v. State, 555 So.2d 784, 796797 (Ala.Cr.App. 1989), a potential juror expressed her opinion as to the defendant's guilt, while the jury panel was being qualified. That potential juror was excused prior to the opening argument and did not participate in any of the jury's deliberations. Therefore, this court noted that the inquiry concerned whether the potential juror's remarks were heard by anyone who ultimately served on the jury. The appellant learned of the potential juror's statement near the end of trial and made a motion for mistrial at that time. The motion was denied. This court indicated that neither defense counsel "made a formal motion that the jury be polled concerning this matter, nor did they request curative instructions of any kind."Id. at 797. Thus, it was held that the defense counsel "failed to pursue the course of action necessary to investigate the potential contamination of their clients' jury."Id. The potential juror's statement made during the voir dire in Gibson v. State, supra, was that she believed "that the girl who was dead, her life meant as much to her as the insurance money meant to him [defendant]." This court held that "if, in fact, [the potential juror's] remarks were overheard by any member of the jury, ineradicable error would not have occurred." Id., citing Hopkins v.State, 429 So.2d 1146, 1152 (Ala.Cr.App. 1983). Clearly, the prospective juror's statement in Gibson v. State, supra, made more mention of the details of the case and the prospective juror's opinion that the defendant was guilty, than the statement in the present case.
 "The decision whether to grant a mistrial is a decision largely within the discretion of the trial court, and the decision rests largely upon the issues and particular circumstances of each case. Wysinger v. State, 448 So.2d 435
(Ala.Cr.App. 1983). The trial court's determination will not be reversed on appeal absent a clear showing of abuse of discretion by the trial court. Saffold v. State, 494 So.2d 164 (Ala.Cr.App. 1986). We find no abuse of discretion here. The denial of the motion for mistrial was proper."
Newsome v. State, 570 So.2d 703 (Ala.Cr.App. 1989) (wherein one prospective juror stated during voir dire examination, "That boy is guilty. He killed that girl." The potential juror also allegedly said that "[i]t was brought out as evidence in the first trial that he had murdered a girl in Germany;" there was further testimony that another potential juror stated, during the voir dire, that "somebody had made the statement that he might not even remember killing the girl if he'd gone into the other personality."). *Page 947 
The trial court did not abuse its discretion in failing to grant the appellant's motion for mistrial. Accordingly, there was no violation of the appellant's federal or state constitutional rights to an impartial jury.
 II The appellant argues that his constitutional rights were violated because the panel, from which the jury was struck, did not represent a fair cross section of the community. Specifically, the appellant argues that the panel did not represent a fair cross section of the community because there were only four black individuals on the 36 person jury panel.
 "The United States Constitution 'does not require an exact proportion between the percentage of blacks in the population and those on the jury list. What is required is that no qualified person can be excluded from jury service.' Butler v. State, 285 Ala. 387, 391, 232 So.2d 631
(1970). See also Johnson v. State, 502 So.2d 877 (Ala.Crim.App. 1987) (neither jury roll nor venire is required to be a perfect mirror of the community); Rayburn v. State, 495 So.2d 733 (Ala.Crim.App. 1986) (defendant must show that minority group is underrepresented on jury rolls and that the underrepresentation is due to systematic exclusion of that group in the jury process)."
Jackson v. State, 549 So.2d 616, 619 (Ala.Cr.App. 1989).
 " 'In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.' Duren [v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979)]."
Wesley v. State, 424 So.2d 648, 649 (Ala.Cr.App. 1982).
In the present case, the appellant merely stated that members of the black race were underrepresented on the jury panel. He failed to meet the requirements set forth in Duren v.Missouri, supra. The appellant has presented no further facts to substantiate his claim, nor has he shown how the jury panel list was obtained. "A defendant is not entitled to a jury with a proportionate number of jurors of his race. Thigpenv. State, 49 Ala. App. 233, 270 So.2d 666 (1972)." Lovev. State, 507 So.2d 976, 977 (Ala.Cr.App. 1986), affirmed,Ex parte Love, 507 So.2d 979 (Ala. 1987). Therefore, the appellant's constitutional rights were not violated on this ground.
 III
The appellant argues that the prosecutor's use of his peremptory strikes to remove blacks from the jury violated the appellant's rights to equal protection, in violation ofBatson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69 (1986). As noted by the state, the appellant's objection on this ground was not made in a timely manner; however, the trial court did not rule on this ground but allowed the State to come forward with its reasons for the strikes. Therefore, we must address the validity of the prosecutor's reasons under the guidelines established in Exparte Branch, 526 So.2d 609 (Ala. 1987). See Ex parteWilliams, 571 So.2d 987 (Ala.Cr.App. 1990). The record indicates that there were four black potential jurors and one black served on the jury. The prosecutor gave the following reasons for his strikes against potential blacks:
 "[PROSECUTOR]: . . . [W]e struck no. 16, Your Honor, which is the first black on the list, for the reason that our records indicate that Mr. Cowan, no. 16, has a prior arrest record. Also he indicated that he did not want — a reason personal to himself that he did not want to serve. Also, Your Honor, he indicated that he knows the defendant's brother.
 "[DEFENSE COUNSEL]: Your Honor, we would ask that the arrest record be made a part of the record, the dates and the nature of the record. *Page 948 
 "THE COURT: Do you have information concerning his prior arrest?
 "[PROSECUTOR]: Yes, sir. Judge my record indicates that in 1970 he was charged with drawing and threatening to use a deadly weapon. I don't know what the disposition was.
 "[ASSISTANT PROSECUTOR]: For the record, Your Honor, the state would show that he did not respond to the question when asked whether or not any members of the panel had been charged with a criminal offense.
"THE COURT: Go ahead.
 "[PROSECUTOR]: As to Juror no. 33, Ms. Patterson, Your Honor, we struck her for the reason that in response to the State's voir dire questioning she initially indicated that because of some prior knowledge of the case she felt that she would not be able to render a fair and impartial verdict. She also responded something to the effect that she did not want to serve. I don't remember just exactly what she said now. As stated earlier by defense counsel, she stated or indicated that she knew a whole lot about the case. So that was another reason. Also, Your Honor, she is a school teacher. Let the record reflect that the State has struck all school teachers for the reason that the defendant in this case was employed as a school teacher and coach in Madison County.
"THE COURT: All right.
 "[PROSECUTOR]: The State struck no. 45, Your Honor, who is Mr. Wilkins. Mr. Wilkins, also, according to our records, has an extensive prior arrest record that he did not admit to when asked if anyone had ever been charged or convicted of any offense. Also, Mr. Wilkins indicated that he knew one of the other jurors. I forget who that was, but I think that was Mr. Cowan.
". . .
"THE COURT: Do you have the record of Mr. Wilkins?
 "[PROSECUTOR]: Judge, we do. We have a record of arrests from Huntsville Police Department that Mr. Barry Tyronn Wilkins that dates back to 1968 up through 1982, showing numerous arrests for —
"THE COURT: Let me see the record.
 "[PROSECUTOR]: Also, Your Honor, I would like for the record to reflect that the State struck everybody from this panel that we knew or suspected had an arrest record. No. 22, Your Honor, was another one of the panel members that we struck because he had a prior arrest record.
 "THE COURT: All right. We will make a copy of this on Barry Wilkins. This record that you have here has two or three pages of arrests.
". . .
 "[PROSECUTOR]: Judge, there are a couple of additional reasons on Mr. Wilkins. We don't feel like we need them, but he responded that he had heard something about this case also, or that he had read something about it. I also asked the question of the jurors if any of them were near the same age of the defendant and he responded in the affirmative to that question. I would like the record to reflect that we tried to strike as many people as we could who were near the same age as the defendant."
Thereafter, the defense counsel noted that there were a number of white jurors who had also indicated that they had read newspaper accounts and a number of white jurors who were in the appellant's age range; however, these white jurors were not struck by the State. The trial court denied the appellant's motion and further stated:
 "For the record I am going to state that Mr. Booker Cowan is the one that approached, I believe, the attorneys during the recess and indicated that he was a friend of the defendant's brother, and also indicated that he did not wish to serve on this jury, which I think is a legitimate reason for him to be excluded from the jury.
"Ms. Patterson, no. 33, on questioning on voir dire by the State — I had made a note on my pad that she would not be able to serve because of a challenge for *Page 949 
cause after her response to the District Attorney's questions. After the defense questioned her and elicited her responses I scratched that out and decided that since the defense opposed her being struck for cause that I would strike her for cause. So I think there is a legitimate reason to exclude her from the jury panel other than her race. She indicated that she had a great deal of knowledge about it. As a matter of fact, you even wanted to quash the panel because of her responses to these questions.
"[DEFENSE COUNSEL]: But, Your Honor —
 "THE COURT: Just a minute. I have let you speak. Now you let me speak. With respect to Mr. Wilkins, the District Attorney has produced a record of a Barry Tyronn Wilkins whose date of birth is March 13, 1948, which is in the age range that he said he was. This record is two pages long and includes that back in 1972 he was tried for armed robbery. He was found not guilty, but he was tried for that offense. There are quite a number of other records on here. I can envision that if we proceed to take this matter to the extreme that we would end up calling every juror in here and going through their life from the day they were born until today and ascertain every minute detail about their existence. I don't think the courts can function if that is the requirement. I don't know of anything that has occurred in this case on behalf of the State, and certainly not on behalf of this court, to stack this jury in any way with a certain number of blacks versus whites. As I have stated, the panel is selected by name from a jury panel that is on the sixth floor. There is no indication on the list that is submitted to me or to any of the attorneys the race or anything else concerning these people, except their name and address. I think the state in this case has offered race neutral reasons for their strikes. I don't see anything constitutionally that would prohibit us from proceeding with the trial of this case."
The state gave valid race-neutral reasons for their strikes against the black potential jurors. Where a prosecutor gives a reason which may be a pretext, such as age, Avery v.State, 545 So.2d 123 (Ala.Cr.App. 1988), but also gives valid additional grounds for the strike, the race-neutral reasons will support the strike. See Davis v. State,555 So.2d 309, 314 (Ala.Cr.App. 1989).
 "We appreciate that it is impossible to know what is in the mind of another person, and that it is possible that, in stating his reasons for striking a black member of the venire, a prosecutor may give a reason that is not the true reason, but we are convinced that the trial judges in our system are in a much better position than the appellate judges to decide whether the truth has been stated."
Scales v. State, 539 So.2d 1074, 1075 (Ala. 1988). The reasons given by the prosecutor in this case were clearly race-neutral. See Wagner v. State, 555 So.2d 1141, 114344 (Ala.Cr.App. 1989).
 IV
The appellant argues that his constitutional rights were violated by the trial court's allowing testimony concerning the victim's identification of him as the perpetrator in a photographic lineup. The appellant bases his argument on the following: the victim did not observe her attacker for a long period of time; the victim did not identify the appellant as her attacker from the photographic lineup until 13 months after the incident; the victim never directly spoke to the investigator who prepared the photographic lineup; and, in the victim's original description of the assailant, she indicated that he had a round face and only two of the photographs used contained individuals with a round face.
Prior to trial, the appellant filed a motion to suppress the photographic lineup presented to the victim as having been unduly suggestive. A suppression hearing was held in which the investigator, who prepared the lineup and presented it to the victim, testified that he showed her the pictures at her place of employment, approximately 13 months after the offense occurred. He testified that, in reviewing *Page 950 
his file prior to making the lineup, he was aware of the physical description which the victim had given to another officer regarding the perpetrator. He testified that he "attempted to find photographs that were as close to his physical description as possible." He further testified that he had had discussions with the officer who had investigated the case, prior to making the lineup. He testified that, in showing the appellant the six pictures contained in the lineup, he in no way indicated to her who he believed to be the perpetrator. He testified that he simply told her that he wanted to know if the person who committed the crime was present in the lineup. The photographs were all approximately the same size and in color, and contained no indication that any of the individuals had a criminal background. The investigator testified that he handed her the photographic lineup at 2:16 p.m. and, at 2:17 p.m., she identified the appellant's photograph, stating that he was the person who had committed the offense. The trial court thereafter overruled the appellant's motion to suppress the photographic lineup.
During the trial, the victim testified that, before she was shown the photographic lineup in question, she had been presented with another lineup and was unable to identify anyone as the perpetrator. Apparently the appellant was not present in that lineup. Thereafter, when shown the present photographic lineup, she testified that she was able to identify the appellant as the attacker, despite the fact that it was 13 months after the offense. She testified that "I feared for my life and I'll never forget that face." She stated that there was no question in her mind but that the appellant was the man who raped her. She also stated that no one present indicated that they wanted her to identify a particular person from the lineup. The victim identified the appellant at trial as the man who had burglarized her hotel room and raped her.
 "This court has previously held that pretrial identifications are to be set aside on grounds of prejudice if the pretrial identification procedure is so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. Scott v. State, 479 So.2d 1343, 1347
(Ala.Cr.App. 1985). It is only when the pretrial procedures used are unnecessarily or impermissibly suggestive that the totality of the circumstances surrounding the out-of-court identification need be analyzed. Coleman v. State, 487 So.2d 1380, 1388 (Ala.Cr.App. 1986)."
Clements v. State, 521 So.2d 1378, 1382 (Ala.Cr.App. 1988). There is no indication in the record that the pretrial procedures used by the police were unnecessarily or impermissibly suggestive.
Moreover, the victim's in-court identification of the appellant was also proper. "When an in-court identification of the accused is shown to have a basis independent of any pretrial identification, then it is properly admitted into evidence. Coleman v. State, supra, 487 So.2d at 1388;Jackson v. State, 414 So.2d 1014, 1018 (Ala.Cr.App. 1982); Matthews v. State, [401 So.2d 241, 246
(Ala.Cr.App.), cert. denied, 401 So.2d 248 (Ala. 1981)]."Id. The victim testified that she was certain that the appellant was the perpetrator when she identified him during the trial. She testified that she was able to view his face clearly, when she observed him through the peep hole of her hotel door before he was able to force his way into the room. She further testified that, because of her fear, she would never forget his face.
"We have repeatedly held that it is the sole province of the jury to determine what credence should be given to testimony of witnesses going to the identity of the accused." Stricklandv. State, 348 So.2d 1105, 1110 (Ala.Cr.App. 1977), cert. denied, 348 So.2d 1113 (Ala. 1977) and cases cited therein. Moreover, the length of time which a victim has to observe an offender, as well as lighting conditions and other factors affecting visibility, are matters to be considered by the jury in determining the weight to be given the identification.Redmon v. State, 47 Ala. App. 421, 255 So.2d 604, 607
(Ala.Cr.App. 1971). The evidence concerning the victim's identifications *Page 951 
of the appellant was properly admitted at trial.
AFFIRMED.
All Judges concur.